No. 26–2217

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE EIGHTH CIRCUIT

SARAH JANE HUNT,
*Interested Party*

RANDAL KING; SCOTT BUTTERFIELD; ROBERT KOEHLER; MICHAEL MERX;
BRUCE WALDMAN, *on behalf of themselves and others similarly situated,*
*Plaintiffs-Appellees,*

*v.*

MONSANTO COMPANY,
*Defendant-Appellee,*

*v.*

CRAIG BOYLAN; DAVID CHILDRESS; XAVIER ESTRADA, LORI ANN FAIN;
DONNA MASON; FREDERICK O'NEILL; EDWARD PETER RANKIN; WILLIAM ROBBINS;
WILLIAM SZABO; PATRICIA VEAL,
*Objectors-Appellants.*

On Appeal from the United States District Court for the
Eastern District of Missouri, Eastern Division
Case No. 4:26-CV-813 (Hon. Henry Edward Autrey)

## PETITION FOR PERMISSION TO APPEAL UNDER 28 U.S.C. § 1453(c)

Robin Greenwald
WEITZ & LUXENBERG, P.C.
Alicia Butler
Robert Quigley
700 Broadway
New York, NY 10003
Tel.: 212-558-5500
rgreenwald@weitzlux.com
abutler@weitzlux.com
rquigley@weitzlux.com

*Counsel for Forty-Eight Objectors*

Ashley C. Keller
John J. Snidow
KELLER POSTMAN LLC
150 N. Riverside Plaza, Suite 4100
Chicago, Illinois 60606
Tel.: 312-741-5220
ack@kellerpostman.com

T. Roe Frazer, II
R. Prescott Sifton, Jr.
FRAZER PLC
30 Burton Hills Blvd., Ste. 450
Nashville, TN 37215
Ph: (615)647-6464
scott@frazer.law

*Counsel for Objector Defendants*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................ii

INTRODUCTION .............................................................................................1

QUESTION PRESENTED ..................................................................................7

RELIEF SOUGHT ............................................................................................7

FACTS AND PROCEDURAL HISTORY ...........................................................7

    A. Thousands of Individual Litigants Have Successfully Pursued
       Monsanto in Roundup Litigation Over the Last Decade. .................7

    B. Monsanto Seeks to Escape Its Roundup Liability and Avoid
       Federal Scrutiny by Rushing a Deeply Flawed Class Settlement
       Through State Court..................................................................10

STATEMENT OF JURISDICTION ....................................................................16

ARGUMENT....................................................................................................17

  I. The Lower Court's Decision Will Encourage Rampant State Court
     Forum Shopping For Collusive Settlement-Only Class Actions. ........17

  II. CAFA Was Enacted To Ensure Nationwide Class Actions Like This
      One Are Heard In Federal Court...........................................................21

CERTIFICATE OF COMPLIANCE ...................................................................26

Appellate Case: 26-2217     Page: 2     Date Filed: 06/29/2026 Entry ID: 5656051

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Amchem Prods., Inc. v. Windsor*,
521 U.S. 591 (1997)................................................................................22

*Anderson v. Monsanto Co.*,
719 S.W.3d 755 (Mo. Ct. App. 2025) ......................................................8

*Bell v. Hershey Co.*,
557 F.3d 953 (8th Cir. 2009).................................................................21

*Brill v. Countrywide Home Loans, Inc.*,
427 F.3d 446 (7th Cir. 2005).................................................................17

*City of Indianapolis v. Chase Nat'l Bank of City of New York*,
314 U.S. 69 (1941).............................................................................5, 19

*Dart Cherokee Basin Operating Co. v. Owens*,
574 U.S. 81 (2014)................................................................................23

*Dennis v. Monsanto Co.*,
339 Cal. Rptr. 3d 175 (Cal. Ct. App. 2025) .............................................8

*Devlin v. Scardelletti*,
536 U.S. 1 (2002)...............................................................................4, 19

*Evans v. Walter Indus.*,
449 F.3d 1159 (11th Cir. 2006)..............................................................22

*Froud v. Anadarko E & P Co. P'ship*,
607 F.3d 520 (8th Cir. 2010).................................................................17

*Gurney's Inn Resort & Spa Ltd. v. Benjamin*,
743 F. Supp. 2d 117 (E.D.N.Y. 2010) ...................................................20

*Hardeman v. Monsanto Co.*,
997 F.3d 941 (9th Cir. 2021)...................................................................8

Appellate Case: 26-2217     Page: 3     Date Filed: 06/29/2026 Entry ID: 5656051

*Hargett v. RevClaims, LLC,*
    854 F.3d 962 (8th Cir. 2017) ...............................................................16

*Hart v. FedEx Ground Package Sys., Inc.,*
    457 F.3d 675 (7th Cir. 2006) ...............................................................17

*Holbein v. TAW Enters., Inc.,*
    983 F.3d 1049 (8th Cir. 2020) .............................................................18

*Home Depot U.S.A., Inc. v. Jackson,*
    587 U.S. 435 (2018) ............................................................................20

*Johnson v. Monsanto Co.,*
    266 Cal. Rptr. 3d 111 (Cal. Ct. App. 2020) ........................................8

*Lott v. Scottsdale Ins.,*
    811 F. Supp. 2d 1220 (E.D. Va. 2011) ................................................19

*Monsanto Co. v. Durnell,*
    No. 24-1068, slip op. (U.S. June 25, 2026) ..........................................10

*State ex rel. Monsanto Co. v. Mullen,*
    672 S.W.3d 235 (Mo. 2023) ................................................................11

*Estate of Pew v. Cardarelli,*
    527 F.3d 25 (2d Cir. 2008) ..................................................................17

*Pilliod v. Monsanto Co.,*
    282 Cal. Rptr. 3d 679 (Cal. Ct. App. 2021) ........................................8

*Reynolds v. Beneficial Nat'l Bank,*
    288 F.3d 277 (7th Cir. 2002) ...............................................................6

*In re Roundup Prods. Liab. Litig.,*
    541 F. Supp. 3d 1004 (N.D. Cal. 2021) ..............................................9

*In re Roundup Prods. Liab. Litig.,*
    No. MDL 2741, 2026 WL 92034 (N.D. Cal. Jan. 13, 2026) ...............8, 9

*Universal Underwriters Ins. v. Wagner,*
    367 F.2d 866 (8th Cir. 1966) ...............................................................20

Appellate Case: 26-2217    Page: 4    Date Filed: 06/29/2026 Entry ID: 5656051

*Westerfeld v. Indep. Processing, LLC*,
621 F.3d 819 (8th Cir. 2010) ...................................................................22, 24

*Yamaha Motor Corp. v. Calhoun*,
516 U.S. 199 (1996) ...................................................................................17

**Statutes**

28 U.S.C.
§ 1332(d) ...................................................................................................1, 5
§§ 1332(d), 1453, 1711-15 ..............................................................................1
§ 1447(a) ......................................................................................................20
§ 1453...........................................................................................................1
§ 1453(c)(1) ...................................................................................................7
§ 1711...........................................................................................................1
§ 1711 note, 119 Stat. 4–5 (2005) ................................................................23
§ 1712...........................................................................................................1
§ 1713...........................................................................................................1
§ 1714...........................................................................................................1
§ 1715...........................................................................................................1

**Other Authorities**

Fed. R. Civ. P. 24(a) ..........................................................................................20

John C. Coffee, Jr., *Class Action Accountability: Reconciling Exit,
Voice, and Loyalty in Representative Litigation*, 100 Colum. L.
Rev. 370 (2000) ...............................................................................................6

Appellate Case: 26-2217    Page: 5    Date Filed: 06/29/2026 Entry ID: 5656051

# INTRODUCTION

This Petition seeks discretionary review, under 28 U.S.C. § 1453(c)(1), of a remand order holding that litigants who properly object to a settlement-only nationwide class action are somehow not parties to the case *at all*.[1] The district court's thinly reasoned decision will have far-reaching implications under the Class Action Fairness Act of 2005[2] ("CAFA"). That is precisely why Congress created discretionary appellate review of otherwise unreviewable remand decisions in class-action cases like this one.

The removed case is a putative nationwide class action composed of *millions* of people. It was filed in Missouri state court on February 17, 2026. The Named Plaintiffs include parties who used Monsanto's Roundup weedkiller and later developed cancer. And it also includes plaintiffs who used Roundup *and never* developed cancer. The putative class definition purports to include *anyone* who has ever purchased or been in contact with Roundup, the vast majority of whom are currently uninjured. The settlement seeks to extinguish their claims *now* (unless they successfully

---

[1] The Order of Remand is attached as Exhibit 1. The accompanying Opinion, Memorandum and Order is attached as Exhibit 2.
[2] 28 U.S.C. §§ 1332(d), 1453, 1711–15.

1

navigated a preposterously onerous opt-out process) rather than when they actually are ripe. No individual plaintiff could sue Monsanto for causing cancer that might or might not occur months, years, or decades in the future. The claims would obviously not be ripe. That has not stopped the uninjured Named Plaintiffs and Monsanto from attempting to use the procedural device of a class action to achieve what substantive law flatly forbids. Many of these people would get little or no compensation after accounting for attorneys' fees and insurance liens. But the plaintiffs' attorneys here surely would: Class counsel propose to receive a staggering $675 million in class fees.

The proposed settlement is nothing new. It attempts a do-over of a nationwide class settlement that was rejected *five years ago* at the preliminary approval stage by the Northern District of California in MDL No. 2741. That same federal court, considering concerns raised by federal litigants about the proposed state-court settlement at issue here, recently described it as "problematic," "bizarre," "inappropriate," "difficult," riddled with "major problems," "mind boggling," and even "filthy." Exhibit 3, Tr. of April 30, 2026 Remote Zoom Videoconference Proceedings, *In re Roundup Prods. Liab. Litig.*, No. 16-MD-02741-VC (N.D. Cal. Apr. 30, 2026) ("April 30, 2026 Tr."),

2

at 31:20-32:15. Knowing their collusive maneuver is doomed in federal court, Named Plaintiffs and Monsanto filed in what they hope will be a friendlier state-court venue. There is reason to believe they are savvy forum shoppers.

From the moment the Named Plaintiffs and Monsanto walked into state court, they were entirely aligned in advocating that the class be approved, extinguishing the claims of all class members. Without public notice or an opportunity to hear objections, the state trial court held a preliminary approval hearing on *the same day* the putative class action was filed. Days later, the trial court preliminarily approved the class and the settlement without a single modification to the 620-page filing Monsanto and Named Plaintiffs submitted. The settlement included onerous opt out procedures and a deadline for class members to object. The objection process required litigants to lodge their objections in state court and, for objectors represented by counsel, required counsel to file a notice of appearance, a "sworn declaration attesting to his or her representation," and even "a copy of the contract" objectors entered with their counsel. Exhibit 4, Preliminary Approval Order, ¶¶ 33-40. Before that objection deadline, petitioners here formally objected in court, noting that the putative class could not be

3

certified and that the settlement was unfair (plus unconstitutional). Dkt. No. 1-09.[3] At the appropriate time, they sought to be heard on their objections to a class that would extinguish their rights for inadequate compensation.

Some of those objectors, the Objector Defendants,[4] then removed the case. Exhibit 5, Notice of Removal. The notice of removal rested on two fundamental points. *First*, by objecting to a class that would extinguish their rights, the objectors became "parties" to the case under the removal statute. Supreme Court precedent establishes beyond doubt that objectors are parties with appellate rights, *Devlin v. Scardelletti*, 536 U.S. 1, 7, 9–10 (2002), so it follows *a fortiori* that they are parties in the trial court when they are opposing relief. If their objections are overruled, they have a right to appeal *as appellants*, *i.e.*, as *parties*. If their objections are sustained and the named plaintiffs ultimately appeal, they can defend the judgment as appellees, *i.e.*, as *parties*. One does not toggle from stranger to party—when asking for the

---

[3] All "Dkt. No." citations refer to the docket below, Case No. 4:26-CV-813-HEA (E.D. Mo.).

[4] The Objector Defendants are Craig Boylan, David Childress, Xavier Estrada, Lori Ann Fain, Donna Mason, Frederick O'Neill, Edward Rankin, William Robbins, William Szabo, and Patricia Veal.

4

*exact same thing*—merely because one tribunal is a trial court and the other is an appellate court.

*Second*, the objectors' notice of removal correctly argued that, under Supreme Court precedent, objectors to a settlement-only class action must be realigned as defendants to the action. *City of Indianapolis v. Chase Nat'l Bank of City of New York*, 314 U.S. 69 (1941) (recognizing district courts' "duty . . . to look beyond the pleadings, and arrange the parties according to their sides in the dispute") (cleaned up)). Importantly, none of those two points implicated the district court's subject-matter jurisdiction. There is minimal diversity jurisdiction and more than $5,000,000 in controversy under CAFA. That means the district court *unquestionably* had *subject matter jurisdiction*. *See* 28 U.S.C. § 1332(d). Instead, both points concern claims-processing rules about who counts as a party-defendant with removal rights under the removal statute.

The District Court's three-page remand order rested entirely on its conclusion that litigants who lodge formal objections to a class are not "defendants." The decision did not cite *Devlin* or *City of Indianapolis*. It did not analyze how a litigant could be a stranger in the trial court and a party on appeal. And it did not specify how a litigant who is entitled to argue *in*

5

*court* against the relief the Named Plaintiffs seek that will directly affect *his rights* is not a "defendant" as a matter of reality.  Instead, the District Court rested its decision on a single out-of-circuit authority.  And that authority did not address those issues, either.

Class actions are powerful procedural devices.  They permit courts to extinguish the rights of millions of absent class members so long as the minimal protections of due process and Rule 23 are satisfied.  It is no secret that these features create opportunities for collusion between plaintiffs' lawyers and defendants, invite "reverse auctions," and otherwise generate perverse economic incentives to trade away the rights of conflicting, absent parties.  *Reynolds v. Beneficial Nat'l Bank*, 288 F.3d 277, 282 (7th Cir. 2002) (Posner, J.); John C. Coffee, Jr., *Class Action Accountability: Reconciling Exit, Voice, and Loyalty in Representative Litigation*, 100 Colum. L. Rev. 370, 392 (2000).

To prevent colluding parties from shopping for the state-court venue that will rubber stamp these sorts of deals, CAFA affords maximalist removal rights to the actual defendants.  Here, that means the objectors or it means nobody.  The question presented is unquestionably important, economically significant (billions of dollars in this case alone), and, if

6

Monsanto and Named Plaintiffs' gambit succeeds, sure to be recurring. Discretionary review is fully justified. 28 U.S.C. § 1453(c)(1).

## QUESTION PRESENTED

Whether, in a settlement-only class action where the named plaintiffs and defendant sought precisely the same relief—a court order approving their pre-negotiated nationwide settlement—the District Court erred in concluding that the *only* litigants opposing that relief are not "defendants" within the meaning of 28 U.S.C. §§ 1441(a) and 1453(b).

## RELIEF SOUGHT

Petitioners already filed a notice of appeal under § 1291, which they maintain supplies this Court with jurisdiction to review the District Court's order. Petitioners alternatively ask the Court to grant this petition for permission to appeal. 28 U.S.C. § 1453(c)(1).

## FACTS AND PROCEDURAL HISTORY

### A. Thousands of Individual Litigants Have Successfully Pursued Monsanto in Roundup Litigation Over the Last Decade.

Since approximately 2015, at least 125,000 individual personal injury and wrongful death plaintiffs have sued Monsanto in state and federal courts throughout the United States. They alleged that they or their loved

7

ones developed non-Hodgkin lymphoma (NHL) as a result of their exposure to Monsanto's weed-killing product, Roundup. *See* Dkt. No. 75, Br. in Supp. of Objs., at 9–10. In October 2016, the Judicial Panel on Multidistrict Litigation created Multidistrict Litigation (MDL) No. 2741 for consolidated federal pretrial proceedings on these claims, and more than five thousand such cases have subsequently been overseen in the MDL.[5] *See In re Roundup Prods. Liab. Litig.*, No. MDL 2741, 2026 WL 92034, at *1 (N.D. Cal. Jan. 13, 2026) (summarizing the history of MDL No. 2741). At least twenty-two such cases have been tried to verdict, with half resulting in verdicts for the plaintiff. Substantial awards of punitive damages have been affirmed on appeal.[6] Thousands of other cases have been settled either individually or

---

[5] Undersigned counsel Robin Greenwald has served as Plaintiffs' Co-Lead Counsel in this MDL for nearly a decade.

[6] *See, e.g., Dennis v. Monsanto Co.*, 339 Cal. Rptr. 3d 175 (Cal. Ct. App. 2025) (affirming award of $7 million in actual damages and $325 million in punitive damages, after finding Monsanto liable on theories of design defect and failure to warn), *rev. denied* (Mar. 11, 2026); *Anderson v. Monsanto Co.*, 719 S.W.3d 755, 763, 788 (Mo. Ct. App. 2025) (affirming "total punitive award [of] just under $550 million"), *reh'g denied* (June 24, 2025), *as modified* (June 24, 2025), *transfer denied* (Sept. 30, 2025), *petition for cert. filed* (U.S. Mar. 4, 2026); *Pilliod v. Monsanto Co.*, 282 Cal. Rptr. 3d 679, 705 (Cal. Ct. App. 2021) (affirming jury's finding of liability on failure to warn and design defect theories and award of $87 million in punitive damages, reduced from jury's award of $2 billion); *Hardeman v. Monsanto Co.*, 997 F.3d 941, 950 (9th Cir. 2021) (affirming verdict including punitive damages award of $20 million, reduced from jury's assessment of $75 million); *Johnson v. Monsanto Co.*, 266 Cal. Rptr. 3d 111, 120 (Cal. Ct. App. 2020) (affirming jury verdict that

8

in mass settlements with different plaintiffs' firms or through a program overseen by the MDL Court. *See*, *e.g.*, *In re Roundup Prods. Liab. Litig.*, 2026 WL 92034, at *1.

Monsanto and its parent, Bayer AG, have worked for years to concoct a permanent solution to their Roundup liability. More than five years ago, Monsanto sought approval of a proposed class action settlement that would resolve the claims of (a) injured Roundup claimants who had not yet retained counsel or filed suit and (b) *future* Roundup claimants who had not yet even been diagnosed with NHL. *See In re Roundup Prods. Liab. Litig.*, 541 F. Supp. 3d 1004, 1006 (N.D. Cal. 2021). The MDL Court denied preliminary approval of the settlement. It found the settlement "clearly unreasonable" as to the proposed future injury class and cited several other "glaring flaws" in the proposal. *Id.*

On June 25, 2026, the United States Supreme Court ruled in a Roundup personal injury case that certain failure to warn claims based on pesticide labeling are preempted by the Federal Insecticide, Fungicide, and

---

included finding of liability for failure to warn and design defect, including award of $10 million in punitive damages, reduced from jury's award of $250 million), *as modified on denial of reh'g* (Aug. 18, 2020).

9

Rodenticide Act (FIFRA), 7 U.S.C. § 136 *et seq.* *Monsanto Co. v. Durnell*, No. 24-1068, slip op. (U.S. June 25, 2026), *available at* https://www.supremecourt.gov/opinions/25pdf/24-1068_n7ip.pdf. The Supreme Court's decision in *Durnell* does not affect the viability of other claims commonly asserted in Roundup personal injury litigation, such as design defect, negligence, and failure to warn claims not premised on product labeling (of which there are many).

**B.  Monsanto Seeks to Escape Its Roundup Liability and Avoid Federal Scrutiny by Rushing a Deeply Flawed Class Settlement Through State Court.**

This proceeding represents Monsanto's second attempt to resolve both present and future injury claims for plaintiffs (and potential plaintiffs) nationwide. Instead of returning to the MDL Court, Monsanto colluded with a group of plaintiffs' attorneys ("Class Counsel") to file a settlement-only class proceeding in the 22nd Judicial Circuit Court for St. Louis City, Missouri. Randall King, Scott Butterfield, Robert Koehler, Michael Merx, and Bruce Waldman (the "Named Plaintiffs"), filed their Class Petition (the state-law equivalent of the complaint) on February 17, 2026, ostensibly seeking certification of a nationwide class of plaintiffs who were exposed to

10

Roundup and have developed, or will in the future develop, NHL. Dkt. No. 1-5.

The Class Petition was not a pleading whereby plaintiffs put defendants on notice of the claims against them. Named Plaintiffs were not asking the state court to certify a class so that they could *litigate their personal injury claims* against Monsanto. Instead, Class Counsel *and Monsanto* filed the petition solely to obtain approval of a settlement agreement that they had *already executed* before walking into court. Monsanto waived service of process and did not answer, but instead joined with the Named Plaintiffs in a set of motions to effectuate the proposed settlement, including an "unopposed" motion for entry of an order granting preliminary approval of a proposed settlement on behalf of the class. Notably, Monsanto (a Missouri corporation with its principal place of business in St. Louis *County*) consented to venue in the 22nd Judicial Circuit Court for St. Louis *City* for the nationwide class proceeding, despite its long-standing position that venue in that Court is improper for out-of-state plaintiffs. *See State ex rel. Monsanto Co. v. Mullen*, 672 S.W.3d 235, 240 (Mo. 2023).

The state court proceeding moved with lighting speed. Literally moments after they filed the proposed settlement agreement, Class Counsel

11

and Monsanto met with the state-court judge, who is assigned to hear Roundup cases filed in St. Louis City, in a thirty-minute, off-the-record proceeding concerning their "unopposed" motion for preliminary approval of the proposed $7.25 billion settlement, which included a request for a stay of tens of thousands of Roundup-related lawsuits against Monsanto that were pending in the State of Missouri. *See* Exhibit 4, Preliminary Approval Order, at 1–2; *see also* Exhibit 3, April 30, 2026 Tr. 33:10–12. Putative class members—including thousands of class members with pending lawsuits affected by the stay requested in the "unopposed" motion for preliminary approval—received no notice of this "hearing" from Class Counsel or Monsanto. Exhibit 3, April 30, 2026 Tr. 32:12–14. Thus, no one who *opposed* the proposed settlement agreement (or, rather, *would have* opposed it had they even known about it) had notice or an opportunity to be heard at the off-the-record state-court proceeding concerning the proposed preliminary approval order and stay of litigation. *Id.* Only Class Counsel and Monsanto—both of whom, of course, were vigorously advocating for approval of the settlement—were present.

Seven days later, after learning of the existence of this action and the purportedly "unopposed" motion for entry of a preliminary order, some of

undersigned counsel (who had not been involved in the class settlement negotiations), along with other attorneys, sought to intervene on behalf of several putative class members. *See* Dkt. Nos. 10, 11. The proposed intervenors asked for additional time to evaluate the 620-page filing before any hearing on the proposed preliminary approval order. *Id.* They also sought an opportunity to be heard on, among other things, the proposed notice and opt-out procedures, the rushed schedule for opt-outs and objections, and the adequacy of Class Counsel's representation in view of certain inherent conflicts. *Id.* A second set of putative class members sought to intervene for similar reasons. Dkt. No. 14.

Just eight days later, however — on March 4, 2026 — the Missouri state court entered the proposed preliminary approval order drafted and submitted jointly by the Named Plaintiffs and Monsanto. Exhibit 4, Preliminary Approval Order. The state court held no hearing on the petitions for intervention or the motion opposing fast-track preliminary approval, and no *actual* hearing on the motion for preliminary approval (beyond its brief private meeting with the settling parties on the day the suit was filed). Among other things, the state court's rubber-stamped preliminary approval order set a deadline of June 4, 2026 for the submission

13

of opt-out requests by class members who wish to be excluded from the proposed settlement, and for the filing of objections. *Id.* at 21. In other words, the state court gave putative class members a choice: they could object or they could opt out, but they could not do both.

On May 21, 2026, Objector Defendants filed objections in the Missouri state court proceedings. They did so pursuant to the Preliminary Approval Order's *requirement* that they "file with the Court a written statement of the objections." *Id.* ¶ 34. They similarly had their attorneys comply with the Order's requirement that any attorney representing objectors "file a notice of appearance with the Court" along with a "sworn declaration attesting to his or her representation of" the objector. *Id.* ¶ 36. The next day, they removed this action to the Eastern District of Missouri. Exhibit 5, Notice of Removal. The Objector Defendants premised their removal on Monsanto's and the Named Plaintiffs' *perfect* alignment in interest on the only matter of dispute in the case: whether the Proposed Settlement should be approved.

Whereas Monsanto and Named Plaintiffs sought approval of that deal (and that is *all* they sought), Objector Defendants vigorously opposed it. So Objector Defendants noted that the district court had a "duty" to realign the parties and recognize Objector Defendants' status as the only real

14

defendants here, since they were "the only parties who oppose approval of the proposed settlement, which is the only relief the other parties to this case jointly seek." *Id.* ¶ 7. Objector Defendants alternatively moved to intervene as a matter of right, which would have unquestionably made them "parties" in the event the district court declined to carry out its realignment "duty." Dkt. No. 84.

Monsanto and the Named Plaintiffs each moved to remand this case to state court. Dkt. Nos. 12, 25. Meanwhile, the Joint Panel on Multidistrict Litigation granted a conditional transfer of the case to the Roundup MDL Court, which Monsanto and the Named Plaintiffs each opposed. Dkt. Nos. 63, 64. On June 4, 2026, certain petitioners here filed objections on behalf of forty-eight individual class members, Dkt. Nos. 70, 75, as well as hundreds of other "involuntary class members" who submitted opt out requests but had yet to learn whether those requests would be honored due to the technical hurdles and opt-out challenge procedures imposed by Monsanto and the Named Plaintiffs, Dkt. No. 71. The settlement also faced significant opposition from other quarters, including 73 "future injury" class members who have not yet been diagnosed with NHL, Dkt. Nos. 67, 74, and a group of health plan payors and administrators, Dkt. No. 62.

On June 17, 2026, the District Court issued an order remanding the case to the 22nd Judicial Circuit Court for St. Louis City, Missouri. Exhibits 1 & 2. The district court did not assess any of the grounds Objector Defendants raised in support of their authority to remove. Instead, resting on a single out-of-circuit authority that itself did not address realignment, the district court concluded that Objector Defendants "are not defendants in the action" under 28 U.S.C. § 1441(a) and so they "have no basis upon which to remove it." Exhibit 2 at 3. From that finding, the district court concluded that it "lacks jurisdiction and the case must be remanded." *Id.* The same day, the Objector Defendants filed a notice of their appeal as of right. The Objector Defendants, alongside 48 similar objectors who join them as petitioners, alternatively seek review of the District Court's remand order under 28 U.S.C. § 1453(c)(1).

## STATEMENT OF JURISDICTION

This Court has jurisdiction to consider this Petition under 28 U.S.C. § 453(c)(1). *Hargett v. RevClaims, LLC*, 854 F.3d 962, 965 (8th Cir. 2017) (noting "jurisdiction to accept appeals from class-action remands" in CAFA cases). Generally, this Court will exercise its discretion to accept a permissive appeal under § 1453(c)(1) if the appeal implicates an "important" or

16

"consequential" question of class action law, particularly those related to jurisdiction and removability under CAFA. *Froud v. Anadarko E & P Co. P'ship*, 607 F.3d 520, 523 (8th Cir. 2010) (per curiam) (relying on *Estate of Pew v. Cardarelli*, 527 F.3d 25, 29 (2d Cir. 2008) (question of removability of particular kind of claim under CAFA was "important and consequential"); and *Hart v. FedEx Ground Package Sys., Inc.*, 457 F.3d 675 (7th Cir. 2006) (question concerning burden of establishing jurisdiction under CAFA was "important")).  Because § 1453(c)(1) "authorizes interlocutory appellate review," the Court may exercise its jurisdiction to remedy *any* errors in the remand order because "it is the district court's entire decision that comes before the court for review." *Brill v. Countrywide Home Loans, Inc.*, 427 F.3d 446, 451-52 (7th Cir. 2005) (citing *Yamaha Motor Corp. v. Calhoun*, 516 U.S. 199, 205 (1996)).

## ARGUMENT

### I. The Lower Court's Decision Will Encourage Rampant State Court Forum Shopping For Collusive Settlement-Only Class Actions.

This appeal presents an exceptionally important question of first impression: who may remove a collusive, nationwide, settlement-only class action that is filed in state court?  The District Court held that objecting class

17

members—the very people whose rights will be extinguished by that kind of collusive deal—are categorically barred from doing so because they are *never*, as a matter of law, "defendants" with a right to remove under §§ 1441(a) and 1453(b). On that basis alone, the district court ordered remand, erroneously concluding that, because Objector Defendants were not *named* as defendants in the case caption, the district court "lacked jurisdiction" over the case.

The district court was surely wrong about its jurisdiction. Section 1441(a) (along with 1453(b)) "on its face is not a jurisdiction-granting provision." *Holbein v. TAW Enters., Inc.*, 983 F.3d 1049, 1054 (8th Cir. 2020). Those provisions "give[] certain state-court defendants access to a federal forum that *already possesses* subject-matter jurisdiction over the type of action being removed," *id.* at 1054 (emphasis added), which in the class action context is § 1332(d). And there is no question that the district court *had* subject-matter jurisdiction here.

But even ignoring the district court's erroneous treatment of its "separately granted subject-matter jurisdiction as dependent on a defendant's right to remove," *Holbein*, 983 F.3d at 1055, the order of remand here has incredibly wide-reaching implications. Citing but one out-of-circuit

18

non-class action authority, the district court held that collusive nationwide settlement-only class actions—over which there is unquestionably federal jurisdiction—can *never* be removed to federal court (except in the near-zero chance the colluding defendant changes its mind less than 30 days after consummating the illicit deal). It came to that conclusion without any analysis whatsoever. It certainly did not grapple with *Devlin v. Scardelletti*, 536 U.S. 1, 7, 9–10 (2002), which definitively holds that objectors *are absolutely* parties at least for purposes of an appeal. Nor did it address Objector Defendants' argument that a litigant who is a party on appeal must also be a party in the trial court when it seeks or opposes the same relief.

The district court similarly (at least implicitly) held that the long-established "duty" of the federal courts to realign the parties when there is no "collision of interests" on "the primary and controlling matter in dispute," *City of Indianapolis*, 314 U.S. at 69, can *never* apply to a settlement-only class. Nevermind that such a class proceeding, by definition, lacks *any* adversity between the *settling* parties. It did not even acknowledge that district courts routinely apply the realignment doctrine in the removal context, including to allow removal by *creating* subject-matter jurisdiction, *e.g.*, *Lott v. Scottsdale Ins.*, 811 F. Supp. 2d 1220, 1223 (E.D. Va. 2011), and by

19

curing nonjurisdictional claims-processing defects, *e.g.*, *Gurney's Inn Resort & Spa Ltd. v. Benjamin*, 743 F. Supp. 2d 117, 126 (E.D.N.Y. 2010). And it waived away even the possibility that objecting class members can properly remove a settlement-only class by exercising their *right* to intervene as defendants. Fed. R. Civ. P. 24(a); *see also* 28 U.S.C. § 1447(a) ("In any case removed from a State court, the district court may issue all necessary orders and process to bring before it all proper parties whether served by process issued by the State court or otherwise.").

Rather than wade into those foundational issues, the district court merely decreed that objecting class members "are not defendants" and so they will *never* have any "basis upon which to remove." Exhibit 2 at 3. But that gets the realignment doctrine totally backwards. Realignment *determines* who the defendant to "the action as defined by the plaintiff's complaint" *actually is*. *Home Depot U.S.A., Inc. v. Jackson*, 587 U.S. 435, 442 (2018) (who "the defendant" is turns on the original pleading, not a *responsive* pleading); *Universal Underwriters Ins. v. Wagner*, 367 F.2d 866, 870 (8th Cir. 1966) (the "question of realignment" is based on the realities underlying the original pleading). It is tautology to say that a party *asking for* realignment is not the defendant *unless* his request is meritorious. That

20

is *why* the request must be addressed, which the District Court unquestionably failed to do.

To be sure, none of these legal issues have easy answers. But they do *have answers*. And considering the gravity of what is at stake—the dissolution of scores of existing and *future* cancer victims' claims without any semblance of due process, along with an order of remand that all but begs unscrupulous lawyers to be the first to undermine the next mass tort through a collusive, state-court class settlement—this Court should provide important guidance. At a minimum, the district court's unreasoned order must be supplemented with *actual* analysis. *See Bell v. Hershey Co.*, 557 F.3d 953, 958–59 (8th Cir. 2009) (in CAFA removal case, vacating district court's remand order below and requiring further explanation where the district court "did not provide any analysis to support its assertion").

## II. CAFA Was Enacted To Ensure Nationwide Class Actions Like This One Are Heard In Federal Court.

It is no accident that Monsanto and Class Counsel elected to file a "problematic" class in state court. Exhibit 3, April 30, 2026 Tr. 16:13-17. They knew *from direct experience* it would have been dead on arrival in any federal court. That is of course what happened *last time* they filed this class action

21

*in* a federal court. Unsurprisingly so. Class settlements (like this one) that purport to bind hypothetical future claimants are unambiguously unlawful under Rule 23. *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997). In a friendly state court, though, the deal has a chance.

That sort of cynical forum shopping is precisely what led Congress to create a liberal path to the federal courts. CAFA was born of "perceived 'abuses of the class action device.'" *Westerfeld v. Indep. Processing, LLC*, 621 F.3d 819, 822 (8th Cir. 2010). The statute's "language and structure . . . indicate[] that Congress contemplated broad federal court jurisdiction with only narrow exceptions." *Id.* (quoting *Evans v. Walter Indus.*, 449 F.3d 1159, 1164 (11th Cir. 2006)). The Court need not intuit that legislative intent through the legislative history. In CAFA's statutory *text*, Congress explained it enacted the law to address "abuses of the class action device that have . . . harmed class members with legitimate claims," "undermined public respect for our judicial system," caused class members to "receive little or no benefit from class actions," including where "counsel are awarded large fees, while leaving class members with coupons or other awards of little or no value," and led to "confusing notices [being] published that prevent class members from being able to fully understand and

22

effectively exercise their rights." 28 U.S.C. § 1711 note, 119 Stat. 4–5 (2005), *available at* https://www.govinfo.gov/content/pkg/STATUTE-119/pdf/ STATUTE-119.pdf. Congress found that these "[a]buses in class actions undermine[d] the national judicial system, the free flow of interstate commerce, and the concept of diversity jurisdiction as intended by the framers of the United States Constitution." *Id.* So it enacted CAFA to address the problem of "[s]tate and local courts . . . keeping cases of national importance out of Federal court." *Id.*

The district court unquestionably had jurisdiction under 28 U.S.C. § 1332(d). Nobody disputed that fact. *Dart Cherokee Basin Operating Co. v. Owens*, 574 U.S. 81, 87 (2014) (removal allegations must be accepted "when not contested by the plaintiff or questioned by the court"). But the District Court nonetheless found it "lack[ed] jurisdiction" because Objector Defendants were not "defendants" under § 1441(a).

That bare conclusion clearly frustrates the fundamental purpose of CAFA. This case belongs in federal court—Congress basically said as much—but Monsanto and Class Counsel will have successfully staved off federal review if the District Court's order stands. Realignment-and-removal is the only avenue to prevent that kind of abuse of the class action

23

vehicle.  And review by this Court—right now—is the only way to ensure Monsanto's and Named Plaintiffs' perverse playbook is not rolled out *en masse* in Missouri state court over and again.

This case alone impacts potentially millions of current and future class members dispersed throughout every state in the nation.  It was *literally* impossible to provide notice to the futures class, because nobody can ascertain who has had exposure to Roundup.  The procedural history here shows *at minimum* that Congress was right to be concerned that state courts are simply ill-equipped to scrutinize and fairly administer this kind of proposed nationwide settlement.  If the remand order stands, a "filthy" deal that could not possibly survive federal-court scrutiny appears likely to sail through state court.  CAFA was enacted to prevent that exact sort of scenario.  Given CAFA's stated purpose of providing "broad federal court jurisdiction with only narrow exceptions," *Westerfield*, 621 F.3d at 822, realignment must at least be addressed here.

If this Court does not resolve the question now, the likelihood of recurrence is high, as is the probability of additional collusion among settling parties to end-run federal review.  Indeed, if the remand order stands, one (repeat player) mass tort defendant will have found a permanent

24

solution to nationwide mass-tort litigation: simply enlist a willing plaintiffs' attorney to file a collusive deal in state court. Other defendants will take note, and have little trouble finding willing participants to join in their efforts.[7]

## CONCLUSION

For these reasons, Petitioners respectfully ask the Court to grant this petition for permission to appeal and to reverse the District Court's remand order.

Dated: June 29, 2026

Robin Greenwald
WEITZ & LUXENBERG, P.C.
Alicia Butler
Robert Quigley
700 Broadway
New York, NY 10003
Tel.: 212-558-5500
rgreenwald@weitzlux.com
abutler@weitzlux.com
rquigley@weitzlux.com

*Counsel for Forty-Eight Objectors*

Respectfully submitted,

*/s/ Ashley C. Keller*
Ashley C. Keller
John J. Snidow
KELLER POSTMAN LLC
150 N. Riverside Plaza, Suite 4100
Chicago, Illinois 60606
Tel.: 312-741-5220
ack@kellerpostman.com

T. Roe Frazer, II
R. Prescott Sifton, Jr.
FRAZER PLC
30 Burton Hills Blvd., Ste. 450
Nashville, TN 37215
Ph: (615)647-6464
scott@frazer.law

*Counsel for Objector Defendants*

---

[7] Class Counsel seek a $675 million fee untethered to any lodestar analysis. Collusive deals are a problem precisely because defendants can use even a grossly inadequate class recovery to enrich class counsel. The economic incentives between defendants and class counsel are not aligned with the interests of actual victims.

25

# CERTIFICATE OF COMPLIANCE

This document complies with the word limit of Fed. R. App. P. 5(c)(1) because, excluding parts of the document exempted by Fed. R. App. P. 32(f) and required by Fed. R. App. P. 5(b)(1)(E), this document contains 5,176 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. 32(a)(6) because this document has been prepared in proportionally spaced typeface using Word in fourteen-point Book Antiqua Font.

Pursuant to Circuit Rule 28A(h), I hereby also certify that electronic files of this Petition and accompanying attachments have been submitted to the Clerk via the Court's CM/ECF system. The files have been scanned for viruses and are virus-free.

*Ashley C. Keller*
Ashley C. Keller

26

Appellate Case: 26-2217     Page: 31     Date Filed: 06/29/2026 Entry ID: 5656051

# CERTIFICATE OF SERVICE

I hereby certify that on June 29, 2019, I electronically filed the foregoing Petition for Permission to Appeal with the Clerk of the Court for the United States Court of Appeals for the Eighth Circuit by using the appellate CM/ECF system.  I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

*Ashley C. Keller*
Ashley C. Keller

Appellate Case: 26-2217     Page: 32     Date Filed: 06/29/2026 Entry ID: 5656051

# EXHIBIT 1

Appellate Case: 26-2217    Page: 33    Date Filed: 06/29/2026 Entry ID: 5656051

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| RANDALL KING, et al., on behalf of themselves and others similarly situated | ) ) ) | |
| Plaintiffs, | ) ) | No. 4:26-CV-813 HEA |
| v. | ) ) | |
| MONSANTO COMPANY | ) ) | |
| Defendants. | ) | |

**ORDER OF REMAND**

In accordance with the Opinion, Memorandum and Order of this date and incorporated herein,

**IT IS HEREBY ORDERED** that the Clerk of the Court is directed to remand this case to the 22st Judicial Circuit, State of Missouri.

Dated this 17th day of June, 2026.

_____
HENRY EDWARD AUTREY
UNITED STATES DISTRICT JUDGE

2

# EXHIBIT 2

Appellate Case: 26-2217     Page: 36     Date Filed: 06/29/2026 Entry ID: 5656051

**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION**

| | | |
|---|---|---|
| RANDALL KING, et al., on behalf of themselves and others similarly situated | ) ) ) | |
| Plaintiffs, | ) ) | No. 4:26-CV-813 HEA |
| v. | ) ) | |
| MONSANTO COMPANY | ) ) | |
| Defendants. | ) | |

**OPINION, MEMORANDUM AND ORDER**

This matter is before the Court on Defendant's Motion to Remand, [Doc. No, 12] and Plaintiff's Motion to Remand, [Doc. No. 25]. For the reasons set forth below, the Motions will be granted.

This matter was removed from the Circuit Court for the City of St. Louis by Craig Boylan, David Childress, Zavier Estrada, Lori Ann Fain, Donna Mason, Frederick O'Neill, Edward Rankin, William Robbins, William Szabo, and Patricia Veal, who are self-styled "Objector Defendants." These "Objectors" claim this Court's jurisdiction is based on 28 U.S.C. § 1332(d). Both Plaintiff and Defendant have moved to remand the action.

On February 17, 2026, Plaintiffs filed a putative class action against Monsanto in the Circuit Court of the City of St. Louis, Missouri, *King v. Monsanto*

*Co*., No. 2622-CC00325, seeking approval of a proposed nationwide class settlement of Roundup-related claims. The Class Action Petition names five individual Plaintiffs and a single Defendant, Monsanto.

On March 4, 2026, the Missouri court entered a Preliminary Approval Order, directed a nationwide notice program, and set deadlines for opt-outs and objections, with a final approval hearing scheduled for July 9, 2026. The Missouri court expressly stated that it had made no final decision on approval and that objectors could raise their arguments through the objection and final-approval process. See Exhibit 2 to Objectors' Notice of Removal ("NOR") at 3–4.

On May 21, 2026, Objectors filed objections in the Missouri court and, the next day, filed the Notice of Removal in this Court. Objectors have also filed a motion to stay proceedings in this Court pending a ruling on transfer to the MDL.

The Objectors attempt to "realign" themselves as defendants in this case classify themselves as "the true defendants" because according to them, they are the only ones who oppose the relief that the named parties want, that being a settlement of class action Round Up claims.

Removal of an action by people who are not defendants in the action is not authorized. Section 1441(a) of Title 28 states that an action "may be removed by *the defendant or the defendants*." 28 U.S.C. § 1441(a).(emphasis added). The text "specifically limits the ability to remove to the 'defendant or the defendants,' and

2

contains no language allowing mistakenly omitted parties, wrongly excluded parties, or any other type of non-defendant to remove an action to federal court." *Sharma v. HSI Asset Loan Obligation Tr. 2007-1 by Deutsche Bank Nat'l Tr. Co.*, 23 F.4th 1167, 1170 (9th Cir. 2022). Objectors are not defendants in the action and have no basis upon which to remove it. The Corut, therefore lacks jurisdiction and the case must be remanded

Accordingly,

**IT IS HEREBY ORDERED** that Defendant's Motion to Remand, [Doc. No, 12] and Plaintiff's Motion to Remand, [Doc. No. 25] are granted.

**IT IS FURHTER ORDERED** that this matter is remanded to the Circuit Court for the City of St. Louis, Missouri.

An appropriate Order of Remand will accompany this Opinion, Memorandum and Order.

Dated this 17th day of June, 2026.

_____
HENRY EDWARD AUTREY
UNITED STATES DISTRICT JUDGE

3

# EXHIBIT 3

Appellate Case: 26-2217    Page: 40    Date Filed: 06/29/2026 Entry ID: 5656051

# **Exhibit 2**

**Pages 1 - 44**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Vince Chhabria, Judge

| | |
|---|---|
| IN RE ROUNDUP PRODUCTS LIABILITY LITIGATION. _____ | ) ) ) ) ) **NO. 16-MD-02741-VC** |
| JOSEPH JONES, Plaintiff, VS. MONSANTO COMPANY, Defendant. _____ | ) ) ) ) ) ) ) **NO. 26-CV-01455-VC** ) ) ) ) |
| GLENN SCHRAMM, Plaintiff, VS. MONSANTO COMPANY, Defendant. _____ | ) ) ) ) ) ) **NO. 26-CV-01461-VC** ) ) ) ) ) |

San Francisco, California
Thursday, April 30, 2026

<u>**TRANSCRIPT OF REMOTE ZOOM VIDEOCONFERENCE PROCEEDINGS**</u>


**(APPEARANCES ON THE NEXT PAGE.)**

REPORTED REMOTELY BY:  Kendra A. Steppler, RPR, CRR
                        Official United States Reporter

**APPEARANCES:**

For Plaintiffs:

        WEITZ & LUXENBERG, P.C.
        700 Broadway
        New York, NY 10003
 BY:  **ROBIN L. GREENWALD, ATTORNEY AT LAW**

        THE MILLER FIRM, LLC
        The Sherman Building
        108 Railroad Avenue
        Orange, VA 22960
 BY:  **DAVID J. DICKENS, ATTORNEY AT LAW**

        WEITZ & LUXENBERG, P.C.
        1880 Century Park East, Suite 700
        Los Angeles, CA 90067
 BY:  **ROBERT J. QUIGLEY, ATTORNEY AT LAW**

        SINGLETON SCHREIBER LLP
        591 Camino de la Reina, Suite 1025
        San Diego, CA 92108-3112
 BY:  **LESLIE A. BRUECKNER, ATTORNEY AT LAW**

        SMITH LAW FIRM & LAW OFFICE
        3201 Loop 306
        #60732
        San Angelo, TX 76904
 BY:  **MARCUS A. SMITH, ATTORNEY AT LAW**

For Defendant:

        WILKINSON STEKLOFF LLP
        2001 M Street, N.W., 10th Floor
        Washington, DC 20036
 BY:  **RAKESH KILARU, ATTORNEY AT LAW**

        GIBSON DUNN & CRUTCHER LLP
        1700 M Street, N.W.
        Washington, DC 20036-4504
 BY:  **DANIEL W. NELSON, ATTORNEY AT LAW**

Also Present:

        **CHRISTOPHER A. SEEGER**
        **PROFESSOR BRIAN T. FITZPATRICK**
        **PETER A. KRAUS**
        **DAVID WOOL**
        **GERSON SMOGER**
        **PROFESSOR NORMAN SILBER**
        **PROFESSOR JUDITH RESNICK**

<u>Thursday - April 30, 2026</u>                     <u>10:33 a.m.</u>

P R O C E E D I N G S

---oOo---

THE COURTROOM DEPUTY:  Now calling Civil Cases 16-2741, In Re Roundup Products Liability Litigation; and 26-1455, Jones v. Monsanto Company; and, lastly, 26-1461, Schramm v. Monsanto Company.

Counsel, please state your appearances for the record, starting with the plaintiff.

MS. GREENWALD:  Good afternoon -- good morning, Your Honor.

MR. SEEGER:  Good --

MS. GREENWALD:  Oh, sorry.

THE COURT:  Go ahead, Ms. Greenwald.

THE COURT REPORTER:  I think you're muted.  Or we couldn't hear you.

MS. GREENWALD:  Um...

THE COURT:  Now we can hear you.

MS. GREENWALD:  Okay.  I'm sorry.

Good morning, Your Honor.  Robin Greenwald for the -- co-lead counsel.

THE COURT:  Hi.

MS. GREENWALD:  Hi.  Nice to see you.

MR. DICKENS:  Good morning, Your Honor.  David Dickens, co-lead counsel.

THE COURT:  Morning.

MR. DICKENS:  Morning.

MR. QUIGLEY:  Good morning, Your Honor.  Robert Quiqley with Weitz & Luxenberg, also for plaintiffs.

THE COURT:  Hi.

PROFESSOR RESNIK:  I'm Judith Resnik.  And I'm a panelist available to the plaintiffs at the Court's behest.

THE COURT:  Hi.

MR. SMOGER:  Gerson Smoger.  I'm for amici Dean Chemerinsky and Ann Bloom.

THE COURT:  Hi.

PROFESSOR SILBER:  Norman Silber for amici consumer scholars.

THE COURT:  Hi.

MR. WOOL:  David Wool for amici Fred Birner.

THE COURT:  Hi.

All right.  Is that it for the lead plaintiffs' side?  It looks like it.

MS. GREENWALD:  I believe so, Your Honor.

THE COURT:  Okay.

Defendants?

MR. KILARU:  Good morning, Your Honor.  Rakesh Kilaru from Wilkinson Stekloff for Monsanto.

THE COURT:  Morning.

MR. NELSON:  Good morning, Your Honor.  Dan Nelson

from Gibson Dunn for the defendant, Monsanto.

**THE COURT:**  Hi.

**PROFESSOR FITZPATRICK:**  Brian Fitzpatrick appearing specially for class counsel here, Mr. Seeger.

**MR. SEEGER:**  Good morning, Your Honor.

**THE COURT:**  Hi.

**MR. SEEGER:**  Good morning, Your Honor.  Chris Seeger appearing for the King class action pending in Missouri state court.

**THE COURT:**  Morning.

**MR. KRAUS:**  Good morning, Your Honor.  Peter Kraus also specially appearing as class counsel in the King matter in Missouri.

**THE COURT:**  Hi.

**MR. KRAUS:**  Hi.

**THE COURT:**  All right.  Is that everybody?

**MR. SMITH:**  Hi, Your Honor.  Sorry.  I think my audio was on mute.  This is Marcus Smith for plaintiff Molly Waldrop.

**THE COURT:**  Hi.

**MR. SMITH:**  Hello.

**THE COURT:**  Okay.  So I'm very impressed to see all these fancy law professors here and everything.  It's an honor to have you all.  But I -- I honestly -- I mean, I don't -- I'm not sure how much there is to discuss.  And let me say why.

There's this -- there's this class-action settlement -- or

this proposed class-action settlement in Missouri.  It covers two groups of people; right?  One is people who will get NHL in the future, allegedly, from glyphosate.  And the other is people who, I guess, already have NHL and claim that they -- claim that they got it from glyphosate.

My job is just to figure out whether anything that's going on in the Missouri case would hinder my ability to exercise jurisdiction over the cases in the MDL.  And so as it relates to the futures class -- right? -- the category of people who have not yet gotten NHL -- there are a lot of people who make a lot of points about, you know, the problems with entering into a class-action settlement agreement that covers those people. But I'm not sure if that is really any of my business, given that my responsibility is just to adjudicate the cases in the MDL, which consists of people who already have NHL and claim that they got the NHL from glyphosate exposure.

So I just don't see -- you know, there were a number of -- again, it was very enjoyable reading all of your amicus briefs and everything.  But I just don't -- but those briefs mostly articulated arguments for how problematic it would be to bind people who have not yet gotten NHL to this settlement agreement that's being pushed forward in Missouri.  And interesting as those arguments are, I don't know -- I don't know if they are relevant to me.

And then -- so then the question is, well, does this

settlement agreement interfere with my ability to exercise jurisdiction over the cases in the MDL, because it covers -- it also covers people who already have NHL and claim that they got it from glyphosate exposure.  And I haven't figured out a way that it does interfere with my ability to manage this MDL.

I think that it -- I think that the -- it is true that the settlement agreement puts a significant burden on people with claims in this MDL and with claims in other cases -- you know, other state court cases -- you know, this opt-out procedure is bizarre.  I've never seen anything like it.  And it's -- it puts people in a difficult position; right?  Because they could probably -- you know -- they might be able to come to me and say, you know, get -- seek a ruling that says, you're not bound by this settlement agreement, whether you opted out or not, because the settlement agreement is so problematic or the procedures are so problematic or whatever.

But they can't -- if you're a responsible lawyer trying to serve the interests of your client, you have to, nonetheless, go through that burdensome opt-out procedure; right?  Because you can't count on any ruling one way or another from me.  And so, you know, the people who are -- the plaintiffs who have cases before me are required -- you know -- they will have no choice but to opt out or try to opt out from this class-action settlement in Missouri.  And that is a burden on them.  And it seems like a -- it, frankly, seems like an inappropriate

burden.

But it doesn't -- the fact that there is this burden on people who are in my MDL doesn't prevent me from exercising jurisdiction over the cases or managing the cases in a meaningful way.

And, you know, this sort of thing -- I mean, I've certainly never seen a settlement like this before.  But this sort of thing happens all the time in the courts; right?  Where you have an individual plaintiff who's pursuing a claim in court.  And then there's some class-action case that's filed in some other court.  And the settlement is reached in the class-action case.  And, you know, notice goes out to the class members.  And the class members have to decide whether to opt out or not.

And that includes the individual plaintiffs who have already brought individual cases in court.  Those plaintiffs have to opt out of the class-action settlement.  That's -- it's an inconvenience.  It's, I could imagine, policy arguments for why somebody -- you know -- somebody who is already pursuing their own case in court on an individual basis shouldn't have to opt out maybe.  But that's -- those are the rules.  And that happens with some regularity in our court system.

And so, you know, from the standpoint of affecting my ability to adjudicate the cases in this MDL, when we're talking about the people who already have NHL and claim that it was

caused by Roundup, yes, they have to go through this burdensome opt-out procedure.  But I don't know how different it is from -- it's somewhat different.  It's different in the degree of burden that's imposed on people.  But I don't know if it's different in kind from the standpoint of interfering with my ability to adjudicate these cases.

So that was a long and rambling spilling of my thoughts to you.  But I think the upshot is that whatever problems there are with this settlement agreement -- and there are many -- that is for the appellate courts in Missouri to address and possibly the United States Supreme Court to address.  But it's not -- it's not for me to address.

So I don't know who's taking the lead for the lead plaintiffs in trying to convince me otherwise, but nobody needs to convince me that there are major problems with this settlement agreement; right?  And what you need to convince me is that this settlement interferes with my jurisdiction over these MDL matters.  And I don't really see how it does.  So that's really the only question I need addressed today.

**MS. GREENWALD:**  Your Honor, that would be Mr. Quigley for the plaintiffs.

**MR. QUIGLEY:**  Okay.  I will try.  Thank you, Your Honor.

So, look, I'm going to try to convince you of one point, which I will say at the start was not fully ventilated in the

briefing, but that as we were preparing for this hearing -- rereading all the cases and so forth -- we see as really at the heart of the issue. I mean, we've talked about the 70 or so cases -- however many cases -- you know, either in the MDL or remanded from the MDL that are subject to these opt-out procedures. But there's also a much bigger problem of -- you know -- there's the futures class, subclass 2, but there are a lot of people with unfiled cases in subclass 1, which vests as of February 17th, 2026.

And, you know, not to be melodramatic about it, but this literally includes cancer patients in the hospital who are sick, who, you know, might not have a lawyer, might not have a lawsuit, but they purport to be bound by this settlement.

And, you know, apart from some of the issues that could be ventilated in the Missouri appellate courts, to cut to the chase, we think there's just a deeper jurisdictional problem here with the authority of a Missouri state court to bind absent class members based on kind of this double-fiction of it being a nationwide class and of representation and so forth.

And, you know, this isn't intended to be an ambush. If the other side needs more briefing time or so on, if the Court is receptive --

**THE COURT:** Well, I mean, I was going to ask that question.

**MR. QUIGLEY:** Yeah, yeah.

THE COURT: I mean, has there ever been a state court class action that foisted upon everybody in the nation a settlement agreement under -- under state law? I mean, I've never heard of one. And I'm -- that was the first thing I thought when I saw the headlines about this settlement, is, can the Missouri state court do that? Can the Missouri state court bind potential plaintiffs -- plaintiffs and potential plaintiffs -- throughout the nation in a settlement agreement?

I don't know. But I just -- I -- that's one of the many potential problems with this settlement agreement. But I just don't know how it's relevant to me. I mean, you're talking about people who haven't brought claims yet. People who -- in class 1, people who have NHL and may believe they got it from Roundup who haven't brought claims yet.

I don't have jurisdiction over those people. You know, I don't -- I don't -- I can't do anything -- I can't issue an injunction against a state court that might affect those people. I mean, those people are not plaintiffs in the MDL.

MR. QUIGLEY: Well, so --

THE COURT: Again, it sounds like the problem you're identifying is a problem that the Missouri appellate courts are going to need to grapple with and probably the U.S. Supreme Court -- or perhaps the U.S. Supreme Court too.

MR. QUIGLEY: Well, respectfully, Your Honor, we think you can grapple with those issues too. You know, we've talked

about the "stranger to the litigation" exception and so forth. But, really, I think the important line of cases is those regarding declaratory relief.

If we're just looking for a substantial interference with your authority under *Atlantic Coast Line*, I understand why you might end up at the analytic endpoint that you do.  But if we're just seeking a simple declaration, which doesn't tell anyone to do or not do anything, but clarifies the rights of people, whether they're in or out of this court, that whatever -- and, look, I mean, we talk about the burdensome opt-out procedures of the settlement, which we think are real. But if a Missouri state court said, "Hey, everyone.  Check this box to keep your rights.  And if you don't check the box, you're bound by the settlement."

That wouldn't be burdensome.  But we still don't think, under the prevailing law -- and this is covered in my professor, who's more eloquent on these points, Judith Resnik's declaration.  But under the kind of minimum context test, we don't think a case like *Phillips Petroleum against Shutts* is controlling.  And we just don't think that, you know, the fiction that there are people representing the best interests of those people gives the Missouri state courts sufficient jurisdiction to exercise what's really coercive authority over out-of-state plaintiffs.

Now, it might be --

THE COURT:  Right.  But I just don't --

MR. QUIGLEY:  Yes.

THE COURT:  I don't understand why a federal judge in California should step in and fix that problem.  I mean, I just don't understand why it's not a problem for the Missouri appellate courts to fix and the Supreme Court -- U.S. Supreme Court to fix, if necessary.

MR. QUIGLEY:  Well, again, those courts could --

THE COURT:  I mean, you described a situation --

MR. QUIGLEY:  Yes.

THE COURT:  I mean, unfortunately, like, there are -- there are lots of situations where, you know, state courts issue rulings that adversely affect people's rights.  And, I mean, we don't usually have other federal courts from other states stepping in to put a stop to that.

MR. QUIGLEY:  Well, I guess we see a fundamental difference where the reason for that is jurisdictional.  It's one thing if the thing the court is doing -- and, you know, this is the *General Motors* case they talk about of -- a federal court says, "We don't like this coupon settlement."  And then a state court says, "Yeah, that coupon settlement is fine."  Even though the Third Circuit said the federal court can't go in and enjoin that because they didn't like the settlement.  And, you know, *Smith* against *Bayer* is a similar case.

But if a court is exercising authority to, you know,

basically, in our view, extinguish both -- you know -- possibly extinguish lawsuits or the right to bring lawsuits, and that's outside of its jurisdiction, we see that as a different kind of infringement.

And even if it's not about the cases currently before you or, you know, the 70 or so cases identified in Mr. Seeger's declaration, it still interferes with people's ability to bring cases to federal court, if they should so choose.

**THE COURT:**  Why?

**MR. QUIGLEY:**  Well, because -- again, this relies on the fiction of both notice and opt-out.  I mean, Ms. Greenwald was going to speak maybe, but I can a bit, about -- you know, without going down a rabbit hole -- some of the issues with the notice in this case.  You know, aspects of the notice that refer to the outcome in the *Durnell* against *Monsanto* case, heard by the Supreme Court on Monday, as possibly wiping out essentially all Roundup litigation.

And, you know, as we pointed out in our briefing, the Supreme Court's order granting the case had said this was on a narrow issue.  Monsanto's counsel conceded the issue was narrow and limited to failure to warn.  The U.S. Solicitor General also made the same concession.

So we think the class notice is materially misleading for that reason alone, without even getting into the issue of the allusions to the Monsanto bankruptcy, where we just have no way

of --

**THE COURT:**  Right.  But you keep --

**MR. QUIGLEY:**  Yes.

**THE COURT:**  But you keep spilling over into, you know, a recitation of all of the many problems with the class settlement; right?  And I have told you, I agree.  I mean, I've -- I've never seen anything like this; right?  This is, frankly, mind boggling.  But that's not the question that is before me.  And I just don't -- I don't see how it would be appropriate for me to step in and put a stop to this, simply because I believe that it would adversely affect other people's rights in California or elsewhere.  I mean, that's just -- that's not for -- that's not for random federal courts to do.

**MR. QUIGLEY:**  Well, I guess, our ask is that --

**THE COURT:**  That's why we have appellate procedures; right?

**MR. QUIGLEY:**  I'm sorry, Your Honor.  I guess, our ask is not that you step in and put a stop to it.  This is not like all those cases where someone doesn't like a class settlement and asks a federal court to enjoin it.  If there were a declaration that, hey, this just doesn't work for some group of people, and they can still file in federal court, or even something more along the lines of, you know, an indicative ruling --

**THE COURT:**  But why -- why -- I mean, what's the

difference?  I'm still making a pronouncement on the validity or invalidity of the class-action settlement that a court is considering in Missouri.  And I just don't -- I mean, if -- I could imagine -- okay.  Let's just say, hypothetically, that we have somebody who, today, doesn't have NHL; right?  And, you know, next year, they get NHL.  And they believe that it's because they were exposed to glyphosate.  And they file a lawsuit.  And that lawsuit ends up in this MDL.

And then Monsanto files a motion to dismiss the lawsuit on the ground that this person is covered by the Missouri settlement agreement.  I mean, the person who filed the lawsuit can articulate all the reasons why it would violate their due process rights to be bound by the Missouri settlement.  And I can consider those arguments at that time.  And as I sit here today, you know, I cannot imagine ruling that that person would be bound by the settlement agreement; right?  Because the settlement agreement seems to be so legally problematic.

But I would hear the arguments.  I would hear Monsanto's argument, and I would hear the argument of the plaintiff, and I would make a -- and if there's any new information that I haven't been given yet that might affect my decision, I would consider that.  But I could issue that ruling then.  And it wouldn't -- and if I -- assuming I did rule that this person who didn't have NHL at the time the settlement agreement was reached and at the time, you know, notice went out -- if I

ruled -- I can rule that that person can proceed in their federal lawsuit, and their rights haven't been infringed at all.  So --

MR. QUIGLEY:  No --

THE COURT:  -- I just don't understand why I should be issuing a declaration now that would -- I mean, a declaration is not just an advisory opinion.  A declaration -- a judicial declaration is something that affects the rights of people and allows -- or it allows people to order their affairs based on that declaration.

And so I would be affecting the state court litigation by doing that.  And I just don't see why it would be necessary for me to do that to ensure that I could adjudicate the Roundup cases that I have.  And I don't see how it would be appropriate for me to do that to try to -- you know -- to try to vindicate the rights of somebody who's not before me.

MR. QUIGLEY:  Well, first, I appreciate Your Honor's receptiveness to possibly fully and fairly considering those kinds of cases when they should come before you in the future in that that alone matters in the situation.

I guess, you know, to your points, first, though it's true that a declaration is not -- you know -- it's not a full injunction.  It's not nothing or an advisory opinion either.  This isn't saying, you know, the settlement doesn't work.  It's providing clarification for people's rights now rather than

after some tortured collateral attack process.

THE COURT:  Right.  But what are you asking me to say? That people don't have to participate in the opt-out process and they're not going to be bound?  I mean, that's -- that is interfering with the state court proceedings.

MR. QUIGLEY:  Well, I guess it's not interfering with the state court proceedings so much as it would be talking about the consequence and the rights of people right now.  It's saying, okay, there's a court out there saying you have to take this action.  We think it's really a bad action, but whether it's -- you know -- whether it's excessive or not, the state court doesn't have the authority to ask that of you in the first place.

And, you know, should someone come forth in the future and try to assert section 3 of the settlement agreement -- you know, kind of force dismissal of cases, anti-suit injunction, and so forth -- that that won't have force because -- and, you know, there could be another wrinkle of if you received actual notice or --

THE COURT:  That's effectively saying --

MR. QUIGLEY:  Yeah.

THE COURT:  -- you don't have to participate in this state court process.  I, federal court in California, decree that whatever the state court says, you don't have to worry about it.

MR. QUIGLEY: Well, first, I will note, I see Professor Resnik has her hand raised.  I don't know if the Court would like to hear from her on these issues, or I can continue.  But I know she has some thoughts about this, as well.

THE COURT: Sure, briefly.

PROFESSOR RESNIK: If I can be helpful.  You're not a random judge; you're the MDL judge.  And what -- what -- I've read the materials more than once.  And I would be flummoxed as a lawyer with people or without to try to figure out what they should do.

Holding aside the problems of the potential misrepresentations and the opt-out and the 11 points and the wet and the dry signatures, all of that's tough.  It's that I tried to get my head around the idea of how Missouri can tell all of us, "Be here by June or you're done," and how I, if I actually had someone in this position, could wisely say either stay away or not.  And you have real people who have to decide whether they jump in or stay out under this regime.

And I keep rereading *Phillips Petroleum* and *Fuld*, the new -- to say -- as I understand the structure from both *Phillips Petroleum* and *Mullane*, there's a structure in which states could, in certain kinds of economic identity of interest kinds of cases, potentially have people from all over come into their court for an adjudication where there is enough

purposeful affiliation.

What we're looking at is a kind of almost revert -- like, *Mullane* was a potential defendant comes in and says settle accounts.  Monsanto, defendant, working with class counsel, says, we want a global peace.  Of course we'd all love global peace.  But it can't say it to everybody who doesn't have any relationship.

And your clients -- "your clients" -- your litigants with whom you have a relationship, in the same way that you've issued statements to transferee judges, would benefit enormously at least from hearing not an injunction, but a declaration, that, as you understand -- as I understand -- whatever you -- I would believe that the law of the jurisdiction over absent plaintiffs is not settled as to this kind of absent plaintiff as distinct from the absent plaintiffs in *Phillips Petroleum*.

It was a pleasure to reread Justice Rehnquist's ode to class actions.  And it's important when the representational structure is identical, and everybody's got an oil and gas lease, and we all know who you are, and --

THE COURT:  So can I just interrupt --

PROFESSOR RESNIK:  Yep, sure.

THE COURT:  -- and ask you just a practical question?

PROFESSOR RESNIK:  Yep.

THE COURT:  What are you asking me that -- what are

you saying that the declaration should say?

PROFESSOR RESNIK:  That as -- that as -- a reading of *Phillips Petroleum*, *Mullane*, and *Fuld* raises grave questions about how a Missouri court could require people -- could tell the world that if you're not in, you would be out, and why you have not adjudicated the merits of the res judicata, collateral estoppel, full faith and credit that may come to pass.  At least as reading now, there hasn't been, in the record so far in Missouri, an understanding -- or an excavation -- of how it is that Missouri can tell the world.

Now, the litigants --

THE COURT:  That doesn't sound like a declaration. That sounds like a law review article.

PROFESSOR RESNIK:  I believe you could declare that the people before you should have the right to understand that a federal judge -- information fiduciary to them -- has reviewed the materials and has grave reservations about it --

THE COURT:  So you want me to declare that I have grave reservations about the validity of this class-action settlement?  I'm willing --

PROFESSOR RESNIK:  No, no, no --

THE COURT:  -- to tell you right now, I have grave reservations about the validity of this class-action settlement and about the effect on the rights of plaintiffs and potential plaintiffs in California.  But that's not a -- that's not what

a declaration is.  That's not what a federal court declaration is.

PROFESSOR RESNIK:  I'd step back one and say you do not understand how the Missouri court has jurisdiction.  I'm bracketing the settlement for a minute.

THE COURT:  But why should I say that?  I mean --

PROFESSOR RESNIK:  Because you've got all these people who are MDL litigants before you who are going to be --

THE COURT:  But what are they going to do with that?  If I say, "I have grave concerns over whether the Missouri court has jurisdiction over these people," what are they going to do with that information?

PROFESSOR RESNIK:  It would inform their lawyers on how they should advise them about whether they should walk into the Missouri courts at all or not.  And I see there are others who are hoping to add to this.

It's -- I think, of all these people -- as I said in the declaration, a quarter of people who file in the federal courts don't have lawyers at all.  We have people before you with lawyers not of whom are as astute as the group that's assembled here.  How would they know how to advise their clients without some form of information from you?  I understand we're on the record, and people will read that there's a very --

THE COURT:  Maybe they should talk to Professor Resnik.

**PROFESSOR RESNIK:**  I --

**THE COURT:**  I mean, because that seems to be what you're asking me to do, is, like, play the role of a law professor and express some doubts and concerns about, you know, whether the Missouri court has jurisdiction over people in California.

**PROFESSOR RESNIK:**  I would suggest that you could declare that it is -- as you understand it, that the Missouri court wouldn't have this extraordinary exercise of jurisdiction, at least as the people before you.  And remember that --

**THE COURT:**  But why is that a question for me as opposed to a question for the Missouri appellate courts and the United States Supreme Court?

**PROFESSOR RESNIK:**  Because -- because you --

**THE COURT:**  Or a question for me if Monsanto tries to bind an existing plaintiff in my case to the settlement agreement, the existing plaintiff in my case is able to seek relief.  And then -- then I've -- then it's not an advisory opinion.  Then I'm being presented with an actual motion to adjudicate somebody's rights.

**PROFESSOR RESNIK:**  The motion, I think, before you asked to adjudicate that the rights of the people who are before you on bracketing the futures are at risk of being -- that they will potentially feel either the fear of bankruptcy

or the fear of inclusion/exclusion indeterminacy. And you're stating that, as far as you understand it, there is less to fear, because it is unclear that it is -- it is clear that this Court doesn't have, under current law, the ability for people who have not purposefully availed themselves as absent plaintiffs to be bound by Missouri.

And I see there's another hand up, so I need to be sure that others come in, as well.

**THE COURT:** Okay. Thank you, Professor Resnik.

Maybe I can go to the King counsel and see if they want to say anything at this point. And then the -- you know -- the lead plaintiffs and the people associated with them can have the last word.

**PROFESSOR FITZPATRICK:** Well, you know, I just wanted to say, Judge, that I asked the question that the movants put before you on my federal courts final exam this year. And --

**THE COURT:** What question is that?

**PROFESSOR FITZPATRICK:** That is the question of whether we should upend 250 years of federalism by allowing a federal judge to tell a state court judge how they adjudicate their class-action settlements.

I'm sorry that Professor Resnik got an F, but it sounds like you're going to get an A. And so, you know, I don't know if there's anything more that I need to say on this. I think you've researched this and are up on all of the issues. But,

you know, if you have any particular questions, I'm happy to try to answer them.

I will add just one little point.  And that is, on pages 13 and 14 of our brief, we cite a bunch of cases where federal judges said, hey, I know I've got a class member in front of me, and I know there's a state court class action that's going to resolve their claim if they don't opt out.  I can't issue some kind of injunction.  In I believe three out of four of those cases, those were state court nationwide class-action settlements.

THE COURT:  Really?

PROFESSOR FITZPATRICK:  Products liability cases -- *GM* was a design defect products liability case.  There's another case -- I think it was *RB2* [sic] -- toys product liability cases.  These are nationwide class cases.

So this -- this is not something that's never happened before.  This happens.  We have a federal system.  The federal judges and the state judges are substitutes.  They're equals.  Some of the Supreme Court cases say this.  There's no rank or superiority here.  And they have the ability to resolve claims just like federal judges do.

And so I don't think this is as crazy as I think the movants do.  I think there's plenty of nationwide class-action settlements going on, even in state courts.

THE COURT:  Okay.  Well, thank you for the A.  I've

never gotten an A before in my post-high school -- actually, I'm not sure I got any A's in high school either.  But having gone to UC Santa Cruz, where they had written evaluations, and Berkeley Law, where they didn't have letter grades, I've never gotten an A before.  So thank you.

I guess I have one question for you, Mr. Fitzpatrick.  Are you here -- I know that you're here to argue that I don't have the authority to issue an injunction or a declaration relating to this class-action settlement in Missouri.  Are you also here to argue that the class-action settlement in Missouri is legally sound?

**PROFESSOR FITZPATRICK:**  No.  That's going to be for Judge Boyer in Missouri to sort out.  And the appellate process there, as you noted -- listen, you've raised great questions.  And you've raised great questions several years ago when you considered one of these before.  And those questions are going to have to get fully aired in Missouri and sorted out there with full appeal up and maybe to the U.S. Supreme Court, as you noted.  So I think those are tough questions, but this is just not the time and place for it.

**THE COURT:**  Okay.  And then another question -- this is more just out of curiosity.  And, Professor Fitzpatrick, I'm not sure this is for you, because I'm guessing you weren't involved in the state court -- the Missouri state court proceedings.

But just -- it's just something I was curious about for Mr. Seeger or whoever.  Was there a -- so the -- so the timing of this -- so there was a motion -- there was a complaint filed, and a motion for preliminary approval of the class-action settlement was filed on the same day; is that right?

**MR. SEEGER:**  Yes, Your Honor.

**THE COURT:**  Okay.  So that -- and that's what happened in my case too, way back when.

**MR. SEEGER:**  Yeah.

**THE COURT:**  And so that was -- and what date was that -- when was that filed?

**MR. SEEGER:**  I think it was February 17th, Your Honor. And I think the preliminary approval order followed two or three weeks after that.

**THE COURT:**  Okay.  So the motion for preliminary approval was filed on around February 17th.  And the Judge preliminarily approved the settlement agreement two or three weeks later, you say.  How long was the -- how long is the settlement agreement?  How many pages is it?

**MR. SEEGER:**  Oh, boy.  Is it about 80 pages?  90 pages.

**THE COURT:**  90 pages?  And was there a public hearing on this motion for preliminary approval?

**MR. SEEGER:**  No.  I mean, counsel for the class -- the

plaintiffs' lawyers and the defense lawyers -- were there in court that day -- answered some questions --

THE COURT:  Which day?

MR. SEEGER:  On the -- February 17th.

THE COURT:  Okay.

MR. SEEGER:  Judge Boyer had some questions he asked both sides.  But that's really all that occurred that first day.

THE COURT:  So could I ask a couple clarifying questions about that?  So you file a motion -- you file a complaint.  And you file a motion for preliminary approval of a class-action settlement on February 17th.  And you have a meeting with -- a private meeting -- with the Judge to discuss it on February 17th.

MR. SEEGER:  When you say "private," Your Honor, it was in open court.  So I'm not sure if I'm reading your question right.  But it was in court.

THE COURT:  Was it transcribed?

MR. SEEGER:  I don't -- I don't know.  I don't know. I don't -- I don't know.  I really just don't know the answer to that.

THE COURT:  Okay.

MR. SEEGER:  I don't think so.  I haven't seen the transcript from that day.

THE COURT:  So -- but nobody knew about it before that

day, because you hadn't filed it --

**MR. SEEGER:**  That's right.

**THE COURT:**  -- before that day; right?

**MS. GREENWALD:**  That's right.

**THE COURT:**  So I gather you prearranged a meeting with the Judge to take place on the day that you filed the complaint and the motion for preliminary approval?  Because, otherwise, all you know, the Judge might have been on vacation that day; right?

**MR. SEEGER:**  Yeah.

**THE COURT:**  So you -- you had communications with the Judge in advance of even filing the complaint --

**MR. SEEGER:**  I did not, Your Honor.  We have -- we have local counsel for both sides.

**THE COURT:**  Okay.  Right.  But the --

**MR. SEEGER:**  Bayer has local counsel --

**THE COURT:**  But the parties -- right? -- Bayer and the plaintiffs sort of prearranged with the Judge this meeting to talk about this preliminary approval motion and complaint that was being filed on February 17th; right?  And when you say you had -- it was a meeting in open court, does that mean, like, the door to the courtroom was unlocked?

**MR. SEEGER:**  Yes.

**THE COURT:**  What does that mean?

**MR. SEEGER:**  It means that it was in the courtroom

and -- you know --

**THE COURT:**  It was in the courtroom, and the courtroom was not locked.

**MR. SEEGER:**  Yeah.  It was in the courtroom.

**THE COURT:**  So --

**MR. SEEGER:**  Correct.

**THE COURT:**  -- if by some miracle somebody had been aware of this filing on that day, they could have come into the courtroom and participated in the meeting you had with the Judge?

**MR. SEEGER:**  Well, you know, Your Honor, I'm not trying to tell you that there was widespread notice that this was --

**THE COURT:**  Right.  I'm just asking --

**MR. SEEGER:**  Yeah.  Yeah.

**THE COURT:**  -- some questions.

**MR. SEEGER:**  Yeah.  I mean --

**THE COURT:**  So there was -- I'm just trying to understand how this went down --

**MR. SEEGER:**  Yeah.

**THE COURT:**  -- right?

**MR. SEEGER:**  Yeah.

**THE COURT:**  So the lawyers for Bayer and for the plaintiffs got in touch with the Judge privately and said, we've got this big nationwide settlement coming, and we're

going to file it on the 17th, and we'd like to meet with you about it on the 17th in your courtroom with the door unlocked.

**MR. SEEGER:** Well, as I said before, Your Honor, I had no -- I did not reach out to chambers. The local people did. But, yes, we knew we were going to go in that day and file the agreement.

**THE COURT:** And the Judge knew that you were coming in that day --

**MS. GREENWALD:** That, I don't know. I don't know if the Judge was in the courtroom or he came out as a result of it. I really --

**THE COURT:** You just surprised the Judge that day and said, we want to talk to you about this?

**MR. SEEGER:** Well, I --

**THE COURT:** I can't imagine that happened.

**MR. SEEGER:** No. But you're asking questions --

**THE COURT:** Okay. So -- and then -- so you have a --

**MR. SEEGER:** -- that would be better asked of the local --

**THE COURT:** You have a meeting with the Judge --

**MR. SEEGER:** Yes.

**THE COURT:** -- on the day you filed it -- presumably a prearranged meeting with the Judge on the day that you filed it -- in his courtroom. You say that the courtroom -- it was in open court, but it was not transcribed, and nobody was aware

that this was happening.

And then there's no hearing at which anybody has an opportunity to discuss with the Judge these concerns that all of these people are raising now.  And the Judge preliminarily approves the settlement, which all of a sudden imposes all these significant obligations on people all over the country, including people who don't even have NHL and may never have heard of Roundup.  And they -- and he did that without giving the other side an opportunity to be heard?

**MR. SEEGER:**  Well, okay.  So if you don't mind, Your Honor, if I could take ten seconds on this.  I'm not pushing back on any suggestions by you about how this was done.  It was not transcribed, as far as I know, and nobody knew about it. Having said that --

**THE COURT:**  In other words, it was filthy.

**MR. SEEGER:**  Having said that, Your Honor, the day it was filed -- it went up on the website -- the Weitz & Luxenberg firm started filing motions that look a lot like what you have in front of you.

All of -- I think the intent is to deal with all of that through the process that will go between now and the final approval hearing.  They're going to have an opportunity -- they've been filing objections on a weekly basis, much of which is before you right now.  And there's going to be a final approval hearing.  We will brief those objections.  They will

be fully heard.  And it will be dealt with at the final approval by Judge Boyer.  I have no idea how those objections will stand up or not.

But you're right.  If the question is, was there a preliminary approval hearing, I wouldn't call it a hearing.

**THE COURT:**  No.  It was a private meeting -- it was a private arrangement between Bayer's counsel and the plaintiffs' counsel and the Judge to get this -- to tee this up really quickly; right?

**MR. SEEGER:**  We went in to file the agreement.  Judge came out.  Had a couple questions.  We answered them and moved on.  That was it.  The whole thing was 30 minutes.

**THE COURT:**  30 minutes for this -- for a settlement of this magnitude?

**MR. SEEGER:**  Well, I've been involved in a number of class actions where there are no hearings before the preliminary approval order is entered.  This wouldn't be the first.

**THE COURT:**  Okay. So -- all right.  Do -- I'm sorry, did you -- Mr. Seeger, was there anything else that you wanted to say -- or Professor Fitzpatrick?

**MR. SEEGER:**  I think that's it, unless you have questions for me, Your Honor.

**THE COURT:**  Okay. All right.  Let's give the people on the other side the -- a chance to have the last word.

**MR. SMOGER:** Your Honor, this is Gerson Smoger. I'm mostly interested in subclass 2, which is the futures, and that's what I wrote on behalf -- with Dean Chemerinsky.

The question -- people mistake what the *Shutts* holding is. It's not an authorization for other jurisdictions. What it is, is a condition of when other jurisdiction have to give res judicata. And if the elements of due process are not found, then the foreign jurisdiction does not have to give res judicata to a class-action settlement.

The only place -- and I think that you expressed that of -- one case came to you. I would urge that it's a lot more than one. The state of Missouri has no power outside of Missouri. They cite a long-arm statute that is only -- that is particularly only for defendants.

So the process will be that every time a case gets filed in any state court outside of Missouri or any federal court outside of Missouri, that they have to -- Monsanto will have to bring a motion to get res judicata.

What happened -- what places this court differently is the vast majority of those state courts are likely to -- if you file in state court -- and a lot of people won't have state court jurisdiction -- they'll have to go to federal court. This court is the transferor court for the MDL. So those cases filed not just in California, but in 49 other states, are going to be transferred to this court.

Individually, then, this Court will have to weigh on the *Shutts* factors of due process inadequacy.  So while it's not now, all futures that file will end up before the MDL court.  So --

**THE COURT:**  Well, not all, because there are a lot of -- there are way more cases in various state courts around the country than there are in this MDL.  Because there's no --

**MR. SMOGER:**  Future filings --

**THE COURT:**  Because there's no diversity.

**MR. SMOGER:**  Excuse me.  Future filings, if they don't file in the state of Missouri, are mostly likely -- except New Jersey -- I guess there's jurisdiction in New Jersey because of Bayer's headquarters.  But, otherwise, if it's in federal court, it's going to go to this MDL court.  If it's in state court and removed -- and I think it's likely the most of these will be filed in federal court -- then, for 48 states, the likelihood is they're going to end up in the transferor court.  And then the -- then the motion -- the collateral attack motion -- and I'd speak on this because I think *Stephenson* has been raised to you, and I argued *Stephenson* in the Second Circuit -- that will end up being this Court's to decide.

**THE COURT:**  Right.

**MR. SMOGER:**  To the extent this Court has given an opinion about where that is -- and I think it should be heard

by the plaintiffs that it's -- that that's going -- that I would imagine that will happen in great degree to the futures.

Now, I don't disagree with that right this minute, this Court doesn't have jurisdiction over people that don't even have NHL, and they're going to file in the future.  But I would weigh that this will be a continuing source of a lot of plaintiffs that attempt to file -- because they want to preserve the ability to have punitive damages in their complaint -- those people are going to file in federal court.

**THE COURT:**  Okay.  But -- so what -- I mean, but -- and I can adjudicate it at that time.  So what's the --

**MR. SMOGER:**  That's why --

**THE COURT:**  Why do I -- why does any of that argue in favor of me issuing an injunction or a declaration now?

**MR. SMOGER:**  It argues in favor of the declaration, because their -- their -- the procedure they're having -- and they assume that there's nothing in their procedure that assumes their ability to control this settlement from the City of St. Louis outside of that.  And it's going to, at some point, be infirm.  And if there's a declaration that says there's an infirmity -- because it's going to end up for this subclass 2 -- so those filings are going to be before this Court before all of this effort and work is done in the Missouri courts.  And in going forward, I think there's a fundamental infirmity for the vast majority of people, because

they're going to end up before this Court.

Now, this Court --

**THE COURT:** Okay.  I understand the argument.  Thank you.

**MR. SMOGER:**  Thank you.

**THE COURT:** All right.  Mr. Silber -- Professor Silber?

**PROFESSOR SILBER:**  Thank you, Your Honor.

Earlier in the conversation, you provided a hypothetical that I think precisely defines the justification for 62.1 on indicative rulings in the federal rules.

Essentially, in the future, it is more than likely that somebody will come to your court seeking -- seeking -- for relief.  And Monsanto or the defendants will use the settlement agreement.  And you will have to, at that time, issue a ruling.  And it may be after a fairness hearing.

I think that the purpose -- if not a declaratory judgment, an indicative ruling would be precisely in order in this situation.  Because, in fact, there are attorneys right now who are trying to advise their clients about --

**THE COURT:** Wait, I'm sorry.  I just pulled up 62.1, because I wasn't sure how that related to this situation.  That's --

**PROFESSOR SILBER:** Well --

**THE COURT:** That's for relief pending appeal.  If a

timely motion is made for relief that the court lacks authority -- that the district court -- lacks authority to grant because of an appeal that has been docketed and is impending -- is pending -- the court can issue an indicative ruling.  What does that have to do with --

**PROFESSOR SILBER:**  I would argue that it's by analogy, Your Honor.  I'm not suggesting that that empowers you.  It's designed for situations in which the district court has no longer got jurisdiction.

But it does seem to me this is a situation in which it would be important to offer indicative guidance to parties right now who are trying to decide what to do.  And it may be in the future that you're -- in fact, it's more than likely that in the future you're going to have to consider just that question.  And your guidance would be very helpful to attorneys who are considering, right now, whether to -- how to steer their clients.

**THE COURT:**  Okay.

Ms. Greenwald, do you want to wrap things up for us?

**MS. GREENWALD:**  I do.  I know this has been a long afternoon.  I just wanted to clarify a couple of issues on what happened in the state court.

So preliminary approval was 15 days after they went before Judge Boyer on -- in March.  And -- and -- I'm sorry -- in February -- on February 17th.

The settlement agreement is 690 pages because there are a lot of exhibits attached to the settlement agreement.  But most importantly, we didn't file notices.  We filed a motion to intervene.  And we had over a dozen law firms that joined us to try to be heard.  We didn't try to change anything.  We just expressed to the Court what our concerns were.  And we never even got a response.

Monsanto and class counsel opposed our motion to intervene, and then we learned that we didn't have -- that our motion to intervene was denied the same time preliminary approval was granted.  I just wanted to give you that procedural history, Your Honor.

**THE COURT:**  Okay.  And, of course, what they would say is, look, the reason that we teed this up -- the reason that we are trying to ram this through so quickly is that we're trying to get the settlement finally approved before the Supreme Court issues a ruling on preemption in the case that was argued on Monday.

And so, you know, on the surface, it might seem highly unorthodox that this is being rammed through so quickly and through this -- you know -- these private communications between the Judge and the lawyers on both sides before the lawsuit is even filed.  But, you know, we have an emergency here, because the Supreme Court is poised to rule that these failure to warn claims are preempted by federal law, and we

need to get this through before that happens.

Just curious what your -- what is your response to that? And I don't know if that's -- Ms. Greenwald, I don't know if that's your territory or somebody else's territory.

MS. GREENWALD:  I can do a couple on that.  So the final approval is in July, which will be after the Supreme Court rules.  So the timing wouldn't even work on that for them.

THE COURT:  I see.

MS. GREENWALD:  So it's July 9th is the final approval hearing.  And, in addition, the Solicitor General -- I'm sorry -- the counsel for Monsanto, at oral argument, acknowledged in a response from Justice Barrett that design defect claims are not impacted by a reversal of *Durnell* --

THE COURT:  Yes.  Although, he did -- he did add that while design defect claims are not preempted, claims that are labeled "design defect claims," but are actually failure to warn claims in disguise, would be preempted; right?

MS. GREENWALD:  He did.  But he also went on to distinguish it from the medical device situation.  And he says the preemption clause in the Medical Device Amendment sweeps in design defect claims.  And here -- FIFRA -- it's really just on the labeling.

THE COURT:  Right.

MS. GREENWALD:  And so he says that.  And we have a

lot of allegations -- as you know -- you've sat through a trial -- there are a lot of allegations that don't have anything to do with the labeling.  And we have a copy of the transcript of the -- the Supreme Court -- if you would like us to provide that to you.

THE COURT:  No, that's okay.  I happened to listen to it yesterday.

MS. GREENWALD:  Okay.

THE COURT:  But it's interesting -- this question has nothing to do with the current motion.  But, I guess, what we're going to have to do -- if the Supreme Court rules that the failure to warn claims are preempted, I guess, we're going to have to sift through all the pending cases in the MDL and see, like, which of them have design defect claims and try and figure out whether those are true -- those are legitimate design defect claims or just disguised failure to warn claims. Is that what my job is going to be?

MS. GREENWALD:  Well, I think that -- maybe if that -- I'm -- hope breeds eternal in my world.  So --

THE COURT:  Yeah, yeah.  No, I'm not -- I'm not predicting an outcome.  I'm just --

MS. GREENWALD:  I know.  I know.

THE COURT:  I'm just saying, if that happens -- if the Court rules that the failure to warn claims are preempted.

MS. GREENWALD:  I would say that's one way that

co-lead counsel can help the Court. And we can figure out who is in the -- still have active cases in the MDL that have not yet been transferred -- or remanded back. And we can at least have a suggestion of whether these various complaints have failure to warn claims that are not based on the label. And we can work with the Court or your clerk or whoever you'd like us to, to figure out how we can assist with the group.

We get a lot of calls from lawyers now. We have a pretty good working relationship with them. We know most of the people in the MDL now, at least by voice or email. And so we could try to assist in that.

And then we I also guess would talk about whether they could amend their complaint if there's not a clear statement about what type of design defect if is to have a clarification of the allegations. But these are things that we probably have to talk to our counsel who have cases before you, before I go too far down the road.

THE COURT: Right. And also curious -- also not relevant -- you know, relevant to the motion that's in front of me now -- but I know that Ken Feinberg has reached out to plaintiffs saying, hey, you know, there is this Supreme Court case, and there is at least -- the Court granted cert in the case. There's at least a possibility the Court will rule that your failure to warn claims are preempted. You know, you have an opportunity -- even if you rejected my settlement offer

before, you have an opportunity to reconsider that.  And for anybody who hasn't participated in my program yet, now's the time to do it.

Have you been able to kind of communicate anything along those lines to plaintiffs in the MDL?

**MS. GREENWALD:**  About -- so we have not.

**THE COURT:**  In other words, hey, there's this Supreme Court decision coming down the pike.  And, you know, we want to remind you all that there is this program that Ken Feinberg has for settling these cases.  And, you know, maybe you want to sort of revisit whether it would be a good idea to engage with Mr. Feinberg.

**MS. GREENWALD:**  We have not done that.  And I think I would be reluctant to do it in that fashion, because if they have a design defect claim, the only question the Supreme Court took was a label-based preemption question.

**THE COURT:**  Right.

**MS. GREENWALD:**  And so I think the -- it would really matter whether they allege a design defect claim or a negligence claim.  It's not dressed as a failure to warn.  I understand that issue.

So I don't know that I could think of a general question that will go across all lines.  Perhaps we should have asked people to consider asking for permission to amend their complaint if it didn't have that.

THE COURT:  No.  I mean --

MS. GREENWALD:  Those are great questions.

THE COURT:  I was just curious.

MS. GREENWALD:  Yeah.

THE COURT:  I mean, I wasn't suggesting you should have done it or anything like that.  I was just curious.

MS. GREENWALD:  No, I had not.

THE COURT:  Okay.

All right.  Anything else?

Does Monsanto have anything to say for itself?

MR. KILARU:  Your Honor, I don't think we need to add to anything that's been said here.

THE COURT:  Okay.  All right.  Sorry, was there -- was there anyone else who wanted to say anything?  I don't -- I'm not seeing any hands up.

Okay.  All right.  Thank you very much.

ALL:  Thank you, Your Honor.

THE COURTROOM DEPUTY:  Court is adjourned.

(Proceedings adjourned at 11:31 a.m.)

---oOo---

**CERTIFICATE OF REPORTER**

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE:   Friday, May 1, 2026

_Kendra Steppler_

Kendra A. Steppler, RPR, CRR

Official Reporter, U.S. District Court

# EXHIBIT 4

Appellate Case: 26-2217    Page: 87    Date Filed: 06/29/2026 Entry ID: 5656051

# **Exhibit 7**

FILED

MAR 04 2026

22ND JUDICIAL CIRCUIT
CIRCUIT CLERK'S OFFICE
BY _____ DEPUTY

**IN THE CIRCUIT COURT OF THE CITY OF ST. LOUIS
STATE OF MISSOURI**

RANDALL KING, SCOTT
BUTTERFIELD, ROBERT KOEHLER,
MICHAEL MERX AND BRUCE
WALDMAN, individually, and on behalf of
all others similarly situated,

    Plaintiffs,

v.

MONSANTO COMPANY,

    Defendant.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case No. 2622-CC00325

Div. 8

## PRELIMINARY APPROVAL ORDER

Before the Court is a motion by Plaintiffs for an order preliminarily approving the Settlement Agreement.

WHEREAS, a proposed Settlement Agreement has been reached by and among defendant Monsanto Company ("Defendant"), by and through its attorneys, and the Class Representatives and Subclass Representatives, by and through Class Counsel and Subclass Counsel, individually and on behalf of a defined proposed Settlement Class and Subclasses;

WHEREAS, the Court, for the purposes of this Preliminary Approval Order, adopts all defined terms as set forth in the Settlement Agreement, which is attached as Exhibit 1 to the Preliminary Approval Motion, filed on February 17, 2026;

WHEREAS, this matter has come before the Court pursuant to the Preliminary Approval Motion;

ENTERED

MAR 04 2026

PAC

WHEREAS, the Defendant does not oppose the Court's entry of this Preliminary Approval Order;

WHEREAS, the Court has considered all of the presentations and submissions related to the Preliminary Approval Motion and, having presided over and managed the proceedings in hundreds of lawsuits alleging injuries caused by exposure to Defendant's glyphosate over the past decade, is familiar with the facts, contentions, claims, and defenses as they have developed in these proceedings, and is otherwise fully advised of all relevant facts in connection therewith;

**IT IS HEREBY ORDERED AS FOLLOWS:**

## I.    PRELIMINARY APPROVAL OF SETTLEMENT AGREEMENT

1.    The Court finds that it has jurisdiction over the action and each of the Parties for purposes of settlement.

2.    The Court finds that the requirements of Missouri Rules 52.08(a), 52.08(b)(3), and 52.08(e) have been satisfied for purposes of preliminary approval of the Settlement Agreement, such that notice of the Settlement Agreement should be directed to Settlement Class Members and a Fairness Hearing should be set.

3.    The Settlement Agreement, including all Exhibits attached thereto, are preliminarily approved by the Court.

## II.    FINDINGS REGARDING THE SETTLEMENT CLASS AND SUBCLASSES

### A.    *Preliminary Class Certification*

4.    Under Rule 52.08(e), in order to direct notice, the Court must find that it is likely to be able to certify the class for purposes of judgment on the proposed Settlement Agreement. To do so, the Court must find it likely that the Settlement Class and Subclasses meet the numerosity,

-2-

commonality, typicality, and adequacy requirements of Rule 52.08(a), the predominance and superiority requirements of Rule 52.08(b)(3), and are ascertainable.

5.    The Settlement Class consists of, only for purposes of the Settlement: those U.S. Persons who, prior to the Settlement Date, have been Exposed to one or more Roundup Products and who: (i) Applied any Roundup Products; (ii) purchased or paid for any Roundup Products or for the Application of any Roundup Products; (iii) participated in, directed, or saw the Application of any Roundup Products; or (iv) otherwise had reason to know of their Exposure. The Settlement Class also includes Derivative Claimants of the foregoing individuals. "Exposed" and "Exposure" mean contact with, inhalation of, ingestion of, or absorption of any Roundup Products in connection with the Application of any Roundup Product. For the avoidance of doubt, Exposure to Roundup Products requires exposure to the product itself and not only to the outside of its packaging. "Application" and "Applied" mean application, preparation, mixing, Handling or use, or any other steps associated with application, whether or not the Settlement Class Member performed the application, preparation, Handling, mixing, use, or other steps associated with application himself or herself.

6.    The following Persons are excluded from the Settlement Class:

a.    judicial officers and associated court staff assigned to this Lawsuit, and their immediate family members;

b.    past and present (as of the Settlement Date) officers, directors, and employees of the Defendant or any of its direct or indirect subsidiaries;

c.    any Person who, prior to the Settlement Date, received consideration in exchange for a release of any Roundup Claims, or received a judgment on

-3-

a Claim relating to a Roundup Product or a Roundup Claim, even if the judgment is on appeal;

    d.    any Person who, as of the Settlement Date, has a claim pending in *In re Roundup Products Liability Litigation*, MDL No. 2741 (N.D. Cal.), provided, however, that any Person within this Paragraph 6(d) who would otherwise be a Settlement Class Member will be included in the Settlement Class upon (1) request and (2) dismissal of their pending claim in such MDL;

    e.    any Person whose Roundup Claims have been dismissed with prejudice as of the Settlement Date, unless such dismissal is subject to appeal, in which case such Person shall be included in the Settlement Class;

    f.    any Person who would be a Settlement Class Member solely because they saw the Application of a Roundup Product but, by the Settlement Date, neither they nor any of their Representative Claimants had reason to suspect that the Roundup Product in question was an herbicide; and

    g.    all those Persons otherwise in the Settlement Class who timely and properly exclude themselves from the Settlement Class in the manner approved by the Court and set forth in the Settlement Class Notice.

7.    The Settlement Class consists of two Subclasses.

    a.    "Subclass 1" means Settlement Class Members who have been diagnosed with NHL as of the Preliminary Approval Date, and their Derivative Claimants.

-4-

b.    "Subclass 2" means Settlement Class Members who have not been diagnosed with NHL as of the Preliminary Approval Date, and their Derivative Claimants.

8.    The Parties have provided sufficient information—including in the Preliminary Approval Motion, and related submissions and presentations—to preliminarily evaluate the prerequisites of Rule 52.08(a) and Rule 52.08(b)(3).  The Court will likely be able to find that, for settlement purposes:  (a) the Settlement Class Members are so numerous that their joinder is impracticable; (b) there are questions of law and fact common to the Settlement Class and Subclasses; (c) the claims of the Class Representatives and Subclass Representatives are typical of the Settlement Class Members and the respective members of the Subclasses; (d) the Class Representatives and Subclass Representatives and Class Counsel and Subclass Counsel have fairly and adequately represented and protected the interests of all Settlement Class Members; (e) the questions of law or fact common to the Settlement Class and Subclasses predominate over any questions affecting only individual Settlement Class Members, and a class action is superior to other available methods for the fair and efficient resolution of the controversy; and (f) the Settlement Class and Subclasses are ascertainable.

9.    Based on the foregoing, the Court preliminarily certifies the Settlement Class and Subclasses for purposes of judgment on the proposed Settlement Agreement.  The Court finds that it will likely be able to certify the Settlement Class and Subclasses, under Rules 52.08(a) and 52.08(b)(3), for purposes of judgment on the proposed Settlement Agreement.

**B.    *Representatives and Counsel***

10.    The following Class Representatives are preliminarily appointed:  Randall King, Scott Butterfield, Robert Koehler, Michael Merx and Bruce Waldman.

-5-

11.     The following Subclass Representatives are preliminarily appointed for each of the Settlement Subclasses:

   a.     Subclass 1:  Randall King, Scott Butterfield and Bruce Waldman; and

   b.     Subclass 2:  Robert Koehler and Michael Merx.

12.     Christopher A. Seeger of Seeger Weiss LLP, Joseph F. Rice of Motley Rice LLC, Peter A. Kraus of Waters Kraus Paul & Siegel, John Eddie Williams Jr. of Williams Hart & Boundas, LLP, Eric D. Holland of the Holland Law Firm, and Michael S. Ketchmark of Ketchmark & McCreight, P.C. are preliminarily appointed as Class Counsel under Rule 52.08(g)(3).

13.     Christopher A. Seeger of Seeger Weiss LLP, Joseph F. Rice of Motley Rice LLC, Peter A. Kraus of Waters Kraus Paul & Siegel, and John Eddie Williams Jr. of Williams Hart & Boundas, LLP are preliminarily appointed as Subclass Counsel for Subclass 1, and Eric D. Holland of the Holland Law Firm and Michael S. Ketchmark of Ketchmark & McCreight, P.C. are preliminarily appointed as Subclass Counsel for Subclass 2 under Rule 52.08(g)(3). Among such counsel, Christopher A. Seeger of Seeger Weiss LLP is preliminarily appointed as Lead Counsel for Subclass 1 and Eric D. Holland of the Holland Law Firm is preliminarily appointed as Lead Counsel for Subclass 2.

## III.    FINDINGS REGARDING THE SETTLEMENT AGREEMENT

14.     Under Rule 52.08(e), in order to direct notice, the Court must find that it is likely to be able to approve the proposed Settlement Agreement as fair, reasonable, and adequate.  Rule 52.08(e)(2) sets forth factors that the Court must consider in reaching the determination that a settlement is fair, reasonable, and adequate including whether:  "(A) the class representatives and class counsel have adequately represented the class; (B) the proposal was negotiated at arm's length; (C) the relief provided for the class is adequate, taking into account:  (i) the costs, risks,

-6-

and delay of trial and appeal; (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims; (iii) the terms of any proposed award of attorney fees, including timing of payment; and (iv) any agreement required to be identified under Rule 52.08(e)(3); and (D) the proposal treats class members equitably relative to each other."

15.     Missouri public policy strongly favors settlement, *see State ex rel. Byrd* v. *Chadwick*, 956 S.W.2d 369, 377 (Mo. App. W.D. 1997) (the "use of temporary settlement classes is beneficial and has salutary effects on the resolution of class action litigation"), *Woodson* v. *Bank of Am., N.A.*, 602 S.W.3d 316, 323 (Mo. App. E.D. 2020) ("Missouri public policy favors settlement."), especially "in class actions and other complex cases where substantial judicial resources can be conserved by avoiding formal litigation," *Cohn* v. *Nelson*, 375 F. Supp. 2d 844, 852 (E.D. Mo. 2005) (citation omitted).

16.     The Court's review is focused on ensuring "that the agreement is not the product of fraud or collusion and that, taken as a whole, it is fair, adequate, and reasonable to all concerned." *Marshall* v. *Nat'l Football League*, 787 F.3d 502, 509 (8th Cir. 2015) (quoting *In re Wireless Tel. Fed. Cost Recovery Fees Litig.*, 396 F.3d 922, 934 (8th Cir. 2005)). In considering a motion for preliminary approval, the Court puts emphasis on whether "the settlement is within the range of possible approval due to an absence of any glaring substantive or procedural deficiencies." *Skinner* v. *Hunt Mil. Cmtys. Mgmt. LLC*, No. SA-22-CV-00799-JKP, 2023 WL 6532670, at *2 (W.D. Tex. Jan. 23, 2023) (citation omitted); *see also In re CenturyLink Sales Pracs. & Sec. Litig.*, No. CV 18-296 (MJD/KMM), 2021 WL 3080960, at *5 (D. Minn. July 21, 2021).

17.     The Parties have provided sufficient information—including in the Preliminary Approval Motion, and related submissions and presentations—to allow the Court to preliminarily

-7-

evaluate the Rule 52.08(e) factors here. Based on this showing, the Court finds that it will likely be able to conclude that the proposed Settlement Agreement is the product of intensive, thorough, serious, informed, and non-collusive negotiations overseen by experienced mediator Fouad Kurdi; has no obvious deficiencies; does not improperly grant preferential treatment to the Class Representatives, Subclass Representatives, or segments of the Settlement Class; and is fair, reasonable, and adequate. Accordingly, the Court has taken the Rule 52.08(e)(2) factors and applicable precedent into account in finding that it will likely be able to approve the proposed Settlement Agreement as fair, reasonable, and adequate.

18.    The Court finds that it will likely be able to approve, under Rule 52.08(e)(2), the proposed Settlement Agreement.

## IV.    NOTICE TO SETTLEMENT CLASS MEMBERS

19.    Adequate notice requires the "best practicable" notice be provided, which must be "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Phillips Petrol. Co.* v. *Shutts*, 472 U.S. 797, 812 (1985) (quoting *Mullane* v. *Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 314–15 (1950)). The notice must also "describe the action and the plaintiffs' rights in it." *Id.*

20.    The Settlement Class Notice set forth in Exhibit E to the Settlement Agreement plainly communicates the rights of Settlement Class Members under the proposed Settlement in language designed to be "understood by the average absentee class member." *State ex rel. Byrd*, 956 S.W.2d at 385 (citation omitted). The Settlement Class Notice Plan set forth in the Preliminary Approval Motion and the Declaration of Dr. Shannon Wheatman ("Wheatman Decl."), attached as Exhibit 5 to the Preliminary Approval Motion, was based on extensive demographic research and is tailored to Settlement Class Members. Wheatman Decl. ¶¶ 18–23, 30, 45–47. It includes direct

-8-

individual notice to Settlement Class Members with tolled or filed Roundup Claims, customers of the Company, and members and employees of more than 240,000 organizations who may be potential Settlement Class Members. *Id.* ¶¶ 52–54. In addition, the Settlement Class Notice Plan includes an expansive multi-lingual publication campaign, *id.* ¶¶ 47, 59–114, and extensive third-party and on-the-ground outreach, *id.* ¶¶ 55–57, 116–25.

21.   Accordingly, under Rule 52.08(c)(2), the Court finds that the Settlement Class Notice and the Settlement Class Notice Plan:   (a) is the best notice that is practicable under the circumstances; (b) is reasonably calculated under the circumstances to apprise Settlement Class Members of (i) the nature of the action, (ii) the Settlement Class definition, (iii) the class claims, issues, and defenses, (iv) their right to enter an appearance through an attorney at the Fairness Hearing, (v) their right to Opt Out or object to any aspect of the Settlement Agreement, (vi) the time and manner for requesting an Opt Out, (vii) their right to revoke an Opt Out prior to entry of the Final Order and Judgment, (viii) the binding effect of the Settlement Agreement (including the Releases provided for therein) on Settlement Class Members, and (ix) the intention of Class Counsel to seek attorneys' fees and costs, and Class Representative and Subclass Representative service awards, as well as the opportunity to object to such fees, costs and awards; (c) constitutes due, adequate, and sufficient notice to all persons entitled to receive notice of the Settlement Agreement; and (d) satisfies the requirements of Rule 52.08, the Missouri Constitution, the United States Constitution (including the Due Process Clause), and other applicable laws and rules.

22.   Under Rule 52.08(e)(1), the Court shall direct notice if the Court finds it will likely be able to approve the proposed Settlement Agreement and certify the class for the purposes of judgment on the Settlement Agreement.   Accordingly, the Court approves the Settlement Class

Notice and the Settlement Class Notice Plan, and hereby directs that the Settlement Class Notice be disseminated pursuant to the Settlement Class Notice Plan to the Settlement Class.

23.     The Settlement Class Notice shall be posted on the Settlement Website, within 10 days after entry of this Preliminary Approval Order, as set forth in Section 11.2 of the Settlement Agreement.

## V.     OPT OUT PROCEDURES

24.     The Opt Out procedure set forth in Section 12.2 of the Settlement Agreement and the instructions in the Settlement Class Notice regarding the procedures that must be followed to Opt Out of the Settlement Class are approved.

25.     To Opt Out validly from the Settlement Class, a Settlement Class Member must submit an individual written request to Opt Out stating, "I wish to exclude myself from the Settlement Class in the 22nd Judicial Circuit Court, City of St. Louis, Missouri" (or substantially similar clear and unambiguous language), and containing the information and materials set forth in Section 12.2(b) of the Settlement Agreement to the Administrator, on or before the date 90 days following the commencement of the Settlement Class Notice Plan pursuant to Section 12.2(a) of the Settlement Agreement.

26.     To be effective, the written request to Opt Out must contain:

    a.     the Settlement Class Member's printed name;
    b.     the Settlement Class Member's address;
    c.     the Settlement Class Member's telephone number;
    d.     the Settlement Class Member's email address, if any;
    e.     the Settlement Class Member's date of birth;

-10-

f.    a copy of his or her identification issued by any Governmental Authority or other bona fide identification;

g.    the dated Personal Signature of the Settlement Class Member seeking to exclude himself or herself from the Settlement Class;

h.    a disclosure certifying to the best of their knowledge whether the Settlement Class Member has or has not entered into an agreement tolling the applicable statute of limitations to bring Roundup Lawsuits or Roundup Claims;

i.    a disclosure certifying to the best of their knowledge whether the Settlement Class Member has or has not filed a Roundup Lawsuit or Related-Party Lawsuit against any Monsanto Parties or Related Parties as of the date of the written Opt Out request;

j.    a disclosure certifying to the best of their knowledge whether the Settlement Class Member has or has not retained counsel in connection with a present or future Roundup Lawsuit or Roundup Claim and, if so, disclosing the name of the retained attorney and law firm; and

k.    a declaration with the Personal Signature of the Settlement Class Member attesting to Exposure to Roundup Products, and if the Settlement Class Member is a member of Subclass 1, attesting to a Qualifying Diagnosis and the date such diagnosis was made.

27.    The Settlement Class Member must: (a) mail the signed written request to Opt Out to a physical address to be identified in the Settlement Class Notice; (b) email a complete and legible scanned copy or photograph of the signed written request to Opt Out to an email address to be

-11-

identified in the Settlement Class Notice; or (c) submit a complete and legible scanned copy or photograph of the signed written request to Opt Out through the Settlement Website. Opt Outs submitted by any Settlement Class Member to incorrect locations shall not be Valid. Attorneys for Settlement Class Members may submit a written request to Opt Out on behalf of an individual Settlement Class Member, but such request must contain the Personal Signature of the Settlement Class Member.

28. No "mass," "class," "group," or otherwise combined Opt Out shall be valid, and no Settlement Class Member may submit an Opt Out on behalf of any other Settlement Class Member. Any Opt Out request simultaneously submitted on behalf of 2 or more Settlement Class Members shall be deemed invalid as to all such individuals. However, where there is both a Settlement Class Member or a Representative Claimant, and one or more Derivative Claimants, the Settlement Class Member's or the Representative Claimant's exercise or failure to exercise his or her Opt Out right shall be binding on the associated Derivative Claimant(s).

29. A Valid Opt Out from the Settlement Class will become effective as of the later of 21 days of receipt by the Administrator or the resolution of any challenge to the validity of the request brought by Class Counsel or the Defendant, pursuant to Section 12.2(f) of the Settlement Agreement. In addition, pursuant to Section 12.2(f) of the Settlement Agreement, any such challenge must be made no later than 7 days following the close of the Opt Out Period, and must be resolved by the Administrator within 7 days of the receipt of the challenge.

30. Any Settlement Class Member who does not submit a timely, written Valid Opt Out shall be bound by all proceedings, orders, and judgments in this action, even if such Settlement Class Member has previously initiated or subsequently initiates litigation against the Defendant.

-12-

31.   Within 7 days after the close of the Opt Out Period, pursuant to Section 12.2(g) of the Settlement Agreement, the Administrator shall provide Class Counsel and the Defendant with a complete list of all Opt Outs that the Administrator believes to be timely and Valid.

32.   The Defendant shall have the right, in its individual discretion, to terminate and render null and void the Settlement Agreement, pursuant to the terms of Section 12.5 of the Settlement Agreement and confidential Exhibit I of the Settlement Agreement.  The Court finds that it is appropriate to keep Exhibit I confidential and under seal.  The Court finds that there is a compelling justification to maintain Exhibit I under seal because disclosure of the Exhibit would be prejudicial to Settlement Class Members.  *See* Mo. S. Ct. R. 55.0275 (effective July 1, 2026); *see also Burch* v. *Qwest Corp.*, No. 06-CV-3523-MJD/AJB, 2012 WL 12978329, at *1 (D. Minn. Jun. 6, 2012) ("[T]here is a compelling basis for sealing the termination provision of the Settlement Agreement, which 'has no legitimate bearing on a class member's decision to opt-out of the settlement, object, or file a claims form.' . . . Sealing this provision will encourage settlement.") (citation omitted); *In re HealthSouth Corp. Sec. Litig.*, 334 F. App'x 248, 250 n.4 (11th Cir. 2009) ("The threshold number of opt outs required to trigger a blow provision is typically not disclosed and is kept confidential to encourage settlement and discourage third parties from soliciting class members to opt out."); *In re Prudential Sec. Inc. Ltd. P'ships Litig.*, 164 F.R.D. 362, 365–66, *aff'd sub nom. In re Prudential Sec. Inc. Ltd. P'ship Litig.*, 107 F.3d 3 (2d Cir. 1996).  To exercise its Termination Right, the Defendant must provide notice of its written election to terminate the Settlement Agreement to Class Counsel and the Court prior to the Fairness Hearing which shall take place on the date set forth in Paragraph 64 of this Preliminary Approval Order.

-13-

## VI.   OBJECTION PROCEDURES

33.    The procedure for objecting to the Settlement Agreement, as set forth in Section 13.1 of the Settlement Agreement, is approved.

34.    A Settlement Class Member who wishes to object to any aspect of the Settlement Agreement must file with the Court a written statement of the objections on or before the date 90 days following the commencement of the Settlement Class Notice Plan as set forth in Section 13.1 of the Settlement Agreement.  The written statement of objections must include:

a.    a detailed statement of the Settlement Class Member's objections, as well as the specific reasons, if any, for each such objection, including any evidence and legal authority the Settlement Class Member wishes to bring to the Court's attention;

b.    the Settlement Class Member's printed name, address, telephone number, written evidence establishing that the objector is a Settlement Class Member, including proof setting forth the circumstances of the Settlement Class Member's Exposure to Roundup Products as set forth in Section 6.3(a)(vii) of the Settlement Agreement (including whether such Exposure was in an occupational or residential context) and, if the objector is a member of Subclass 1, proof of a Qualifying Diagnosis and the date such diagnosis was made, as set forth in Section 6.3(a)(vi) of the Settlement Agreement;

c.    any other supporting papers, materials, or briefs the Settlement Class Member wishes the Court to consider when reviewing the objection;

d.    a certification that the objector has read the objection and agrees with it;

-14-

e.   the Settlement Class Member and their counsel's full history of prior objections to class action certification and approval, including the case name, case number, identity of the court, and date of each such filing; and

f.   the dated Personal Signature of the Settlement Class Member making the objection, in addition to any filing requirements of the Court regarding signatures.

35.   All objections shall be filed on or before the date set forth in Paragraph 59 of this Preliminary Approval Order, or they will be deemed waived.   Objections submitted by any Settlement Class Member to incorrect locations shall not be valid.

36.   A Settlement Class Member may object on his or her own behalf or through an attorney hired at that Settlement Class Member's own expense, provided that the Settlement Class Member has not submitted a written request to Opt Out.   Attorneys asserting objections on behalf of Settlement Class Members must:  (a) file a notice of appearance with the Court by the date set forth in Paragraph 59 of this Preliminary Approval Order; (b) file a sworn declaration attesting to his or her representation of each Settlement Class Member on whose behalf the objection is being filed or a copy of the contract (to be filed *in camera*) between that attorney and each such Settlement Class Member; and (c) comply with the procedures described in Section 13.1 of the Settlement Agreement.

37.   A Settlement Class Member (or counsel individually representing him or her, if any) seeking to make an appearance at the Fairness Hearing must file with the Court, by the date set forth in Paragraph 59 of this Preliminary Approval Order, a written notice of his or her intention to appear at the Fairness Hearing stating the matters the Settlement Class Member intends

-15-

to present to the Court. Filing a written statement of objections is a prerequisite to appearing at the Fairness Hearing, but this requirement may be excused for good cause shown.

38.   Class Counsel and/or the Defendant may seek reasonable discovery from any objectors.

39.   On or before the date 30 days after the deadline to file an objection and the close of the Opt Out Period, Class Counsel and Counsel for the Defendant shall file any response to the objections, or any papers in support of final approval of the Settlement Agreement.

40.   Any Settlement Class Member who fails to comply with the provisions of Section 13.1 of the Settlement Agreement will waive and forfeit any and all rights he or she may have to object to the Settlement Agreement. The assertion of an objection under Section 13.1 of the Settlement Agreement does not operate to Opt Out the Person asserting it, or otherwise exclude that Person, from the Settlement Class. A Person within the Settlement Class can Opt Out of the Settlement Class and Settlement only by complying with the provisions of Article XII of the Settlement Agreement and Paragraphs 24–30 of this Preliminary Approval Order.

## VII.   FAIRNESS HEARING

41.   A Fairness Hearing shall take place on a date no sooner than 30 days following the deadline to file an objection and the close of the Opt Out Period, at which the Court will consider submissions regarding the proposed Settlement Agreement, including any objections and responses thereto, and whether: (a) to approve thereafter the Settlement as fair, reasonable, and adequate, pursuant to Rule 52.08 of the Missouri Rules, (b) to certify the Settlement Class and Subclasses for settlement purposes only, and (c) to enter the Final Order and Judgment. The Fairness Hearing shall be subject to adjournment by the Court without further notice, other than that which may be posted by the Court on the Court's website.

-16-

## VIII.   STAY ORDER

42.   All Roundup Lawsuits and Related-Party Lawsuits brought by Settlement Class Member Parties in any court of the State of Missouri are stayed, and all Settlement Class Member Parties are enjoined from prosecuting any such claims in the courts of the State of Missouri, pending the Court's consideration of and entry of a Final Order and Judgment in this matter.  The stay and prohibition set forth in this Paragraph 42 shall remain in effect until entry of the Final Order and Judgment.

43.   This stay order is entered pursuant to the Court's authority under Section 476.070 of the Revised Statutes of Missouri and under Rule 52.08(d) and the Court's Rule 52.08(e) findings set forth above, in aid of its jurisdiction over the Settlement and the settlement approval process under Rule 52.08(e). The Court is well within its authority to issue such a stay. *See U.S. Bank, N.A.* v. *Coverdell*, 483 S.W.3d 390, 401 (Mo. App. S.D. 2015); *City of Bridgeton v. City of St. Louis*, 18 S.W.3d 106, 113 (Mo. App. E.D. 2000). *See also In re BankAmerica Corp. Sec. Litig.*, 350 F.3d 747, 752–53 (8th Cir. 2003); *Ressler* v. *Clay County,* 375 S.W.3d 132, 136–37 (Mo. App. W.D. 2012); *In re Nat'l Football League Players' Concussion Inj. Litig.*, 301 F.R.D. 191, 203–04 (E.D. Pa. 2014); *In re Diet Drugs Products Liability Litigation,* 282 F. 3d 220 (3d Cir. 2002); *Love* v. *First Crown Financial Corp.*, 662 S.W.2d 283, 286–87 (Mo. App. W.D. 1983); *Hayes v. Integrity Land Title Co.,* Amended Preliminary Approval Order, No. 11SL-CC01529; *Parisot v. U.S. Title Guaranty Co.,* Preliminary Approval Order, No. 0822-CC09381; The Court finds that it would be prejudicial to Settlement Class Members and to the settlement approval process for trials to take place, or for other significant litigation activity to take place, while the Court is considering this matter.  The Court further finds that the stay order would conserve judicial resources.  The Court also notes that the pendency of *Monsanto Co.* v. *Durnell*, 607 U.S. ___ (2026) (No. 24-1068,

-17-

2025 Term) also counsels in favor of a stay of Roundup Claims in the State of Missouri, as numerous courts in other jurisdictions have concluded. Paragraph 42 of this Preliminary Approval Order shall not apply to any Opt Outs beginning as of the date their Opt Out becomes effective which, pursuant to Paragraph 29, is the later of 21 days of receipt by the Administrator or the resolution of any challenge to the validity of the request brought by Class Counsel or the Defendant.

## IX.   OTHER PROVISIONS

44.     Judge Glenn A. Norton is preliminarily appointed to serve as the Settlement Special Master.

45.     BrownGreer PLC is preliminarily appointed to serve as the Administrator.

46.     Matthew Garretson of Garretson, LLC is preliminarily appointed to serve as the Allocation Special Master.

47.     Wolf Global Compliance, LLC is preliminarily appointed to serve as the Healthcare Compliance Administrator.

48.     Signal Interactive Media, LLC is appointed to serve as the Settlement Class Notice Agent.

49.     No later than 10 business days after entry of this Preliminary Approval Order, the Defendant shall make the payment into the Settlement Fund of $500 million as set forth in Section 4.1(b) of the Settlement Agreement, of which $22 million may be used before the entry of the Final Order and Judgment for Administration Costs, including to effectuate the Settlement Class Notice Plan.

50.     No later than 20 business days before the deadline to file an objection, Class Counsel shall file a motion for attorneys' fees and costs, and Class Representative and Subclass

-18-

Representative service awards, as set forth in Section 14.3 of the Settlement Agreement. Following Final Court Approval, the Court shall establish a process for counsel other than Class Counsel to submit applications, within 90 days, for a portion of the award of attorneys' fees, as set forth in Section 15.2 of the Settlement Agreement.

51. The Defendant has the right to communicate orally and in writing with, and to respond to inquiries from, Settlement Class Member Parties on matters unrelated to the Settlement Agreement in connection with the Defendant's normal business.

52. If the Settlement Agreement is terminated or is not consummated for any reason, the Court's findings with respect to preliminary certification of the Settlement Class and Subclasses shall be void, and the Plaintiffs and the Defendant shall be deemed to have reserved all of their rights with respect to any and all class certification issues.

53. Class Counsel, Counsel for the Defendant, the Settlement Special Master, the Administrator, the Allocation Special Master, the Healthcare Compliance Administrator, and the Settlement Class Notice Agent are authorized to take, without further Court approval, all actions under the Settlement Agreement that are permitted or required to be taken following entry of this Preliminary Approval Order and prior to entry of the Final Order and Judgment, including effectuation of the Settlement Class Notice Plan.

54. Lead Counsel for Subclass 1 and Lead Counsel for Subclass 2 may recommend to the Settlement Special Master the formation of committees composed of plaintiffs' counsel as necessary to effectively carry out the responsibilities of Class Counsel under the Settlement Agreement or this Preliminary Approval Order. The Settlement Special Master shall have discretion whether to approve the formation of any such committees. Lead Counsel for Subclass 1 and

-19-

Subclass 2 shall have ultimate responsibility for coordinating and directing the efforts of any such committees formed.

55.   Class Counsel and Counsel for the Defendant are authorized to use all reasonable procedures in connection with administration and obtaining approval of the Settlement Agreement that are not materially inconsistent with this Preliminary Approval Order or the Settlement Agreement, including making, without further approval of the Court, minor changes to the Settlement Agreement, to the form or content of the Settlement Class Notice, or otherwise to the extent the Parties jointly agree such minor changes are reasonable and necessary.

56.   The Court shall maintain continuing jurisdiction over these proceedings for the benefit of the Settlement Class as defined in this Preliminary Approval Order.

## X.   SCHEDULE OF DATES

57.   On March 5, 2026, the Settlement Class Notice shall be posted on the Settlement Website, so as to commence the Settlement Class Notice Plan.

58.   On or before March 18, 2026, the Defendant shall make the payment into the Settlement Fund set forth in Section 4.1(b) of the Settlement Agreement.

59.   On or before May 7, 2026, Class Counsel shall file a motion for attorneys' fees and costs, and Class Representative and Subclass Representative service awards.

60.   On or before June 4, 2026, objections to the Settlement Agreement and Notices of Intention to Appear at the Fairness Hearing shall be filed with the Court in this action.

61.   On or before June 4, 2026, requests to Opt Out must be postmarked, emailed, or submitted through the Settlement Website.  This date is the close of the Opt Out Period.  All requests received after this date shall be deemed untimely and invalid.

-20-

62. On or before June 11, 2026, the Administrator shall provide Class Counsel and the Defendant with a complete list of all Opt Outs that the Administrator believes to be timely and Valid.

63. On or before July 6, 2026, Class Counsel and Counsel for the Defendant shall file any response to the objections, or any papers in support of final approval of the Settlement Agreement.

64. Before July 9, 2026, if choosing to exercise its Termination Right, the Defendant shall provide notice of its written election to terminate the Settlement Agreement to Class Counsel.

65. The Fairness Hearing shall take place on the 9th day of July, 2026 at 9:00am.

66. The deadlines set forth in Paragraphs 56–63 of this Preliminary Approval Order may be extended, and the Fairness Hearing may be adjourned, by Order of the Court, for good cause shown, without further notice to the Settlement Class Members, except that notice of any such extensions or adjournments shall be included on the Settlement Website. Settlement Class Members should check the Settlement Website regularly for updates and further details regarding extensions of these deadlines.

**SO ORDERED** this 4th day of March, 2026.

SS074

Circuit Judge Timothy J. Boyer

-21-

# EXHIBIT 5

Appellate Case: 26-2217    Page: 110    Date Filed: 06/29/2026 Entry ID: 5656051

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

<table>
<tr>
<td>
RANDALL KING, SCOTT BUTTERFIELD,<br>
ROBERT KOEHLER, MICHAEL MERX, AND<br>
BRUCE WALDMAN, <i>on behalf of themselves<br>
and others similarly situated</i>,<br><br>
<b>Plaintiffs,</b><br><br>
<b>v.</b><br><br>
MONSANTO COMPANY,<br><br>
<b>Defendant.</b>
</td>
<td>
Case No. 4:26-cv-813<br><br>
<b>JURY TRIAL DEMANDED</b>
</td>
</tr>
</table>

**OBJECTOR DEFENDANTS' NOTICE OF REMOVAL**

Pursuant to 28 U.S.C. §§ 1332(d), 1441, 1446, and 1453, objectors to the proposed class settlement ("Objector Defendants"),[1] remove this action from the Circuit Court of the City of St. Louis, Missouri to the United States District Court for the Eastern District of Missouri. Objector Defendants provide the following grounds for removal. *See* 28 U.S.C. § 1446(a).

**INTRODUCTION**

1.      There is no question that there is federal jurisdiction over this case. This is a putative nationwide class action where it is undisputed that there is minimal diversity and well over $5,000,000 in controversy. Under 28 U.S.C. § 1332(d), this case could (and should) have been originally filed in federal court. Objector Defendants here are properly realigned as the true defendants—because they are the only ones who *oppose* the relief that the other parties—the

---

[1] The Objector Defendants are: Craig Boylan, David Childress, Zavier Estrada, Lori Ann Fain, Donna Mason, Frederick O'Neill, Edward Rankin, William Robbins, William Szabo, and Patricia Veal.

named Plaintiffs and Monsanto—jointly *want*. So Objector Defendants now exercise their right to remove.

2. In an ordinary lawsuit, the parties come to court adverse to each other. Indeed, adversity is hardwired into the "case" or "controversy" requirements of Article III. A plaintiff requests relief through a judgment against a defendant. A defendant opposes that relief. Adversity is the whole point. Not here. The Named Plaintiffs and Monsanto (the "Settling Parties") walked into court arm in arm, asking for *precisely* the same thing: judicial approval of a deal that *both* sides want. Indeed, in a turn of litigation events one does not see every day, the Named Plaintiffs and Monsanto are filing *joint briefs together*, precisely because they are in effect parties to a joint-prosecution arrangement and are joined on the same side of the "v." *See* **Ex. 1**, *In re Roundup Prods. Liability Litig.*, No. 3:16-md-02741-VC, Dkt. 21985 at 1 n.1 (N.D. Cal. Apr. 21, 2026) ("this brief is submitted jointly on behalf of Monsanto and Class Counsel"). The only ones opposing the deal are the Objector Defendants.

3. And no wonder. This class action was filed not to litigate active claims, but to launder a liability-management scheme through the courts. The Settling Parties ask the Court to bless what the district-court judge presiding over the related MDL described as "problematic," "bizarre," "inappropriate," "difficult," riddled with "major problems," "mind boggling," and indeed "filthy."[2] That bargain is engineered to wipe away Monsanto's Roundup exposure for pennies on the dollar, extinguish Objector Defendants' rights, and fence injured claimants (and future claimants) into a regime designed to block them from exercising the opt-out rights that are supposed to protect against this kind of abuse.

---

[2] **Ex. 2**, Transcript of Remote Zoom Videoconference Proceedings at 31:20-32:15, *In re Roundup Products Liability Litigation*, No. 16-MD-02741-VC (N.D. Cal. Apr. 30, 2026) ("Chhabria Transcript").

4. The interests of Monsanto and the Named Plaintiffs are *entirely* aligned. Together, the Settling Parties finalized the 690-page Proposed Settlement agreement before the class petition was even filed. Class counsel admitted in open court that they colluded with Monsanto to set up a prearranged private meeting (not a public hearing) with the Missouri trial court to "file the agreement."[3] The meeting lasted thirty minutes and the Settling Parties arranged for it to occur *off the record*.[4] Just two weeks later, the Missouri trial court gave the Named Plaintiffs, Class Counsel, and Monsanto precisely what they *all* asked for when it preliminarily approved the settlement.

5. This massive, nationwide class action was preliminarily approved in half the time it typically takes a true defendant to even answer a complaint. That is only possible due to the utter lack of adversity between Monsanto and the Named Plaintiffs: there is no "collision of interests" between the Settling Parties on the "primary and controlling matter in dispute." *City of Indianapolis v. Chase Nat. Bank of City of New York*, 314 U.S. 63, 69 (1941). The Named Plaintiffs and Monsanto are, and always have been, perfectly aligned on the *only* judicial relief the class petition seeks: approval of the proposed settlement. They are "colloquially speaking, partners in litigation." *Id.* at 74.

6. The only parties who oppose the relief the Settling Parties seek are the Objector Defendants. Each developed Non-Hodgkin Lymphoma after using Roundup for years. And each has a right to pursue their claims against Monsanto in court. But the Proposed Settlement, if approved, will bind them to unconscionably low compensation for their injuries unless they (and

---

[3] *Id.* at 29:5-32-33:12.

[4] *Id.* at 31:22-32:15 ("I'm not pushing back on any suggestions by you about how this was done. It was not transcribed, as far as I know, and nobody knew about it. Having said that -- THE COURT: In other words, it was filthy.").

thousands of similarly situated Roundup victims) successfully navigate the outrageous opt-out procedures the Settling Parties have asked the Missouri trial court to bless.

7.     Consistent with its "duty . . . to look beyond the pleadings and arrange the parties according to their sides in the dispute," *City of Indianapolis,* 314 U.S. at 69 (cleaned up), the Court must realign Objector Defendants as true defendants. After all, they're the *only* parties who oppose approval of the proposed settlement, which is the *only* relief the other parties to this case jointly seek. If the Objector Defendants aren't defendants, then this case is the Named Plaintiffs and Monsanto versus nobody.

8.     As defendants, Objector Defendants have a statutory right to remove under 28 U.S.C. §§ 1441(a) and 1453(b). They timely exercised that right, having received the initial pleadings less than 30 days ago.

9.     And this case is unquestionably removable. Even without realignment, there is federal jurisdiction under the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d).  In other words, there is no question that this case *could have* been filed in federal court in the first instance. The only reason this case was not in federal court to begin with is that the Settling Parties believed their perverse and collusive deal would be dead on arrival under Rule 23. *See Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997).

## BACKGROUND

10.     For more than a decade, thousands of Roundup users have sued Monsanto for causing their cancer. Courts across the country have awarded some of those plaintiffs billions of dollars in damages. Tens of thousands of plaintiffs have filed their cases and await their day in court. And many more Roundup users will learn that they have cancer or will develop cancer in the years to come.

4

11. The Settling Parties' Proposed Settlement attempts to sweep in all those injured victims (and future victims), forcing them into a deal that extinguishes their claims in exchange for pennies on the dollar. Monsanto, for its part, will pay $7 billion to relieve itself of tens of billions in liability. A nice deal for a corporation that has been hit with multiple billion-dollar verdicts in *single-plaintiff* trials and which set aside more than *$15 billion* for Roundup liability five years ago.[5] And Class Counsel will (if they have their way) collect $675 million in attorneys' fees for their role in secretly ushering a collusive deal that is *designed* to trample on the rights of victims whose interests they purport to serve. *See* **Ex. 3** (Fee Petition).

12. The Settling Parties hashed out that "filthy" deal in private and before this case was even filed. While Monsanto and Class Counsel were drafting the agreement, they informed the Missouri trial court of their intent to file it and to immediately seek preliminary approval. **Ex. 2** (Chhabria Transcript) at 29:5-33:12. The Named Plaintiffs filed the Class Action Petition (naming Monsanto as the putative defendant) on February 17, 2026. *See* **Ex. 4** (Class Action Petition). At literally the same time, they also filed an *unopposed* motion for preliminary approval of the proposed settlement. **Ex. 5** (Unopposed Motion for Entry of the Preliminary Approval Order); **Ex. 6** (Proposed Class Action Settlement Agreement).

13. Immediately after filing, Class Counsel, Monsanto, and the Missouri trial court judge held a pre-arranged meeting without providing notice to a single interested party. As Judge Chhabria noted, "[i]t was a private meeting . . . between Bayer's counsel and the plaintiffs' counsel and the Judge to . . . tee this up really quickly." **Ex. 2** (Chhabria Transcript) at 33:6-9. Class Counsel and Monsanto "went in to file the agreement" and the trial court "asked a couple questions," which

---

[5] *See* Wall Street Journal, *Bayer Plans for Roundup Litigation Claims Rising by $4.5 Billion* (July 29, 2021), available at https://www.wsj.com/us-news/law/bayer-plans-for-roundup-litigation-claims-rising-by-4-5-billion-11627579574.

Class Counsel and Monsanto "answered . . . and then moved on." *Id.* at 33:10-12. "The whole thing was 30 minutes." *Id.* at 33:12.  "Nobody was aware that this was happening." *Id.* at 31:22-25.  And there was no transcript created. *Id.* at 28:15-24 (" Q. Was [the hearing] transcribed? A. I don't -- I don't know. I don't know. I don't -- I don't know. I really just don't know the answer to that. A.  Okay. A. I don't think so. I haven't seen the transcript from that day."). *Id.* at 28:15-24. Even for a "settlement of this magnitude," everything was done in less than an hour and entirely off-the-record. *Id.* at 33:10-14.

14.     Just fifteen days later, the trial court granted preliminary approval of the 690-page settlement agreement. **Ex. 7** (Preliminary Approval Order).

15.     The Settlement Agreement is "mind boggling." **Ex. 2** (Chhabria Transcript) at 15:4-13.  It sweeps into the class anyone who developed (or later develops) cancer from Roundup products. That includes plaintiffs in active litigation throughout the country, people with a cancer diagnosis who have not yet discovered that it was caused by Roundup, those who have cancer but have not yet been diagnosed, and even those who have not yet developed cancer.

16.     And the settlement imposes unconscionable hurdles to limit or extinguish class members' opt-out rights.[6] Anyone who does not opt out by June 4, 2026, is bound by the settlement. *See* **Ex. 7** (Preliminary Approval Order) at ¶ 60. Incredibly, that includes "class members" who do not yet know that they have cancer, and those who do not even *have* cancer yet.

17.     Objector Defendants developed Non-Hodgkin lymphoma after using Roundup for years.[7] Under the Proposed Settlement Agreement, each would be a class member bound by Settling Parties' deal.

---

[6] *See* **Ex. 8** (Objections).
[7] **Ex. 9** (Boylan Affidavit) ¶ 5; **Ex. 10** (Childress Affidavit) ¶ 5; **Ex. 11** (Estrada Affidavit) ¶ 5; **Ex. 12** (Fain Affidavit) ¶ 5; **Ex. 13** (Mason Affidavit) ¶ 5; **Ex. 14** (O'Neill Affidavit) ¶ 5; **Ex. 15**

18.     Objector Defendants received copies of the Class Action Petition and Proposed Settlement on or after May 12, 2026.[8] They were never formally served.

19.     Objector Defendants filed their objections in the Missouri trial court on May 22, 2026. **Ex. 8** (Objections).

20.     Objector Defendants timely removed on May 22, 2026, ten days after receiving copies of the initial pleading. *See* **Ex. 8** (Objections).

## BASIS FOR REMOVAL – CAFA JURISDICTION

21.     This Court has original jurisdiction of this case under CAFA, 28 U.S.C. § 1332(d). "Under CAFA, federal courts have jurisdiction over class actions in which the amount in controversy exceeds $5,000,000 in the aggregate; there is minimal (as opposed to complete) diversity among the parties . . . and there are at least 100 members in the class." *Westerfeld Indep. Processing, LLC,* 621 F.3d 819, 822 (8th Cir. 2010) (citing 28 U.S.C. § 1332(d)).

22.     The Settling Parties seek approval of a more than $7 billion settlement. **Ex. 6** (Proposed Settlement) § 4.1; *see* 28 U.S.C. §§ 1332(d)(2) ($5,000,000 amount-in-controversy requirement); 1332(d)(6) (aggregating claims for amount-in-controversy purposes). The proposed class includes "tens of thousands of members." **Ex. 4** (Class Action Petition) at ¶ 172; *See* 28 U.S.C. § 1332(d)(5)(2) (100 class-member minimum). And there is minimal diversity because at

(Rankin Affidavit) ¶ 5; **Ex. 16** (Robbins Affidavit) ¶ 5; **Ex. 17** (Szabo Affidavit) ¶ 5; **Ex. 18** (Veal Affidavit) ¶ 5.

[8] *See* **Ex. 9** (Boylan Affidavit) at ¶ 2 (received notice on May 12, 2026); **Ex. 10** (Childress Affidavit) at ¶ 2 (received notice on May 12, 2026); **Ex. 11** (Estrada Affidavit) at ¶ 2 (received notice on May 13, 2026); **Ex. 12** (Fain Affidavit) at ¶ 2 (received notice on May 14, 2026); **Ex. 13** (Mason Affidavit) at ¶ 2 (received notice on May 12, 2026); **Ex. 14** (O'Neill Affidavit) at ¶ 2 (received notice on May 13, 2026); **Ex. 15** (Rankin Affidavit) at ¶ 2 (received notice on May 12, 2026); **Ex. 16** (Robbins Affidavit) at ¶ 2 (received notice on May 12, 2026); **Ex. 17** (Szabo Affidavit) at ¶ 2 (received notice on May 12, 2026); **Ex. 18** (Veal Affidavit) at ¶ 2 (received notice on May 12, 2026).

least one of Objector Defendants is a citizen of a state different from Monsanto (a Delaware and Missouri citizen) and Named Plaintiffs. **Ex. 4** (Class Action Petition) at ¶¶ 11 (Florida Named Plaintiff), 12 (California Named Plaintiff), 13 (Florida Named Plaintiff), 14 (Missouri Named Plaintiff), 15 (Missouri Named Plaintiff), 17 (Monsanto is a Delaware company with its headquarters and principal place of business is in Missouri); **Ex. 9** (Boylan Affidavit) at ¶ 1.b (Iowa resident); **Ex. 10** (Childress Affidavit) at ¶ 1.b (Indiana resident); **Ex. 11** (Estrada Affidavit) at ¶ 1.b (Washington resident); **Ex. 12** (Fain Affidavit) at ¶ 1.b (Indiana resident); **Ex. 13** (Mason Affidavit) at ¶ 1.b (Massachusetts resident); **Ex. 14** (O'Neill Affidavit) at ¶ 1.b (Vermont resident); **Ex. 15** (Rankin Affidavit) at ¶ 1.b (Wisconsin resident); **Ex. 16** (Robbins Affidavit) at ¶ 1.b (Massachusetts resident); **Ex. 17** (Szabo Affidavit) at ¶ 1.b (New Hampshire resident); **Ex. 18** (Veal Affidavit) at ¶ 1.b (Georgia resident).

<div align="center">

**REALIGNMENT OF THE PARTIES**

</div>

23.     The Class Petition identifies the Named Plaintiffs as the putative plaintiffs and Monsanto as the putative defendant. But the Named Plaintiffs' and Monsanto's interests are *perfectly* aligned. The Class Petition was filed for a singular purpose: to obtain approval of Proposed Settlement. On information and belief, Monsanto was as much a master of the Class Petition as the Named Plaintiffs, and played a substantial role in drafting it and approving its contents. If a plaintiff is supposed to be the master of the complaint, *Winfrey v. City of Forrest City, Arkansas*, 882 F.3d 757, 758 (8th Cir. 2018), Monsanto is every bit as much a plaintiff as the Named Plaintiffs. Both Monsanto and the Named Plaintiffs seek approval of the settlement they agreed upon before they came into court. The only parties who oppose approval of the settlement are the Objector Defendants. Objector Defendants are therefore properly situated as defendants.

24.     Federal courts are not bound by the nominal designations of the parties in the pleadings. Indeed, they have a "duty . . . to look beyond the pleadings and arrange the parties

<div align="center">8</div>

according to their sides in the dispute." *City of Indianapolis,* 314 U.S. at 69 (cleaned up). If there is no "collision of interest[s]" between the plaintiff and a nominal defendant on the "primary and controlling matter in dispute," then courts must realign the parties such that the case caption matches the parties' *actual* interests. *Id.* at 74.

25. Here, the *only* question in dispute is whether the proposed settlement should be approved. Both Monsanto and the Named Plaintiffs argue that the Court should answer "yes" to that question. They "are, colloquially speaking, [acting as] partners in litigation." *Id.* Indeed they are *literally* acting as partners in litigation. In defending the settlement before the MDL court, they submitted one brief "jointly on behalf of Monsanto and class counsel" who supposedly represent interests directly opposed to Monsanto's. *See* **Ex. 1**. This chicanery was done for obvious reasons. The Named Plaintiffs[9] (and their Class Counsel[10]) and Monsanto[11] stand to benefit immensely from the Proposed Settlement—Class Counsel to the tune of hundreds of millions of dollars, Monsanto to the tune of billions.

26. The Objector Defendants, on the other hand, oppose the relief sought in the Class Petition. The Proposed Settlement is specifically designed to resolve, limit, and extinguish their claims against Monsanto. If approved, it would bind Objectors (and many thousands of other Monsanto victims) to unconscionable release provisions, covenants not to sue, and opt-out requirements. *See* **Ex. 8** (Objections).

27. The only "collision of interests" in this case is between the Settling Parties and the Objector Defendants. "What [the Named Plaintiffs] want[] [Monsanto] wants and [Objector

---

[9] *See* **Ex. 3** (Fee Petition) at 17 (seeking service awards "in amounts of $10,000 or greater" to each of the Named Plaintiffs).

[10] *Id.* at 3 (seeking $675,000,000 in attorneys' fees for Class Counsel).

[11] Under the Proposed Settlement, Monsanto will pay $7 billion to resolve tens of billions worth of liability.

9

Defendants] do[] not want." *City of Indianapolis,* 314 U.S. at 74. Because this action seeks to bind the Removing Parties, adjudicate their rights, and extinguish their claims without their participation as named parties, they are properly characterized as defendants here.

## PROCEDURAL REQUIREMENTS FOR REMOVAL

28.    Because Objector Defendants are in fact the defendants here, they have a statutory right to remove. *See* 28 U.S.C. §§ 1453(b) (class actions may be removed "in accordance with section 1446," except that Section 1446's one-year bar and unanimous consent requirement do not apply); 28 U.S.C. § 1446(a) (allowing defendants to remove).

29.    This Notice of Removal is timely under 28 U.S.C. §§ 1446(b)(1) because it is "filed within 30 days after the receipt by [the Objectors] . . . of a copy of the initial pleading." *See supra,* n.8 (identifying dates each Objector received copies of the class petition and proposed settlement).

30.    Pursuant to 28 U.S.C. § 1446(a), true and correct copies of all process, pleadings, and orders served in the state court action are being filed with this Notice of Removal.

31.    The written notice required by 28 U.S.C. § 1446(d) will be promptly filed in the Circuit Court of the City of St. Louis, Missouri and promptly served on all adverse parties.

## CONCLUSION

For these reasons, Objectors remove this lawsuit to this Court pursuant to 28 U.S.C. §§ 1332(d), 1441, 1446, and 1453.

Dated: May 22, 2026

Respectfully submitted,

*/s/ R. Prescott Sifton, Jr.*
R. Prescott Sifton, Jr., #50550
**FRAZER PLC**
30 Burton Hills Blvd., Ste. 450
Nashville, TN 37215
Ph: (615)647-6464
scott@frazer.law

10

Ashley Keller (*Pro hac vice forthcoming*)
**KELLER POSTMAN LLC**
150 N. Riverside Plaza, Suite 4100
Chicago, Illinois 60606
Ph: 312-741-5220
ack@kellerpostman.com

*Counsel for Objector Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on May 22, 2026, I caused a true and complete copy of the foregoing to be electronically filed via the Court's ECF system, which will cause a copy to be served upon all counsel of record.

/s/ R. Prescott Sifton, Jr.
R. Prescott Sifton, Jr.

11